ORAL ARGUMENT NOT YET SCHEDULED

**No. 22-5277**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————

END CITIZENS UNITED PAC,
              *Plaintiff-Appellant*,

*v.*

FEDERAL ELECTION COMMISSION,
              *Defendant-Appellee*,

———————

NEW REPUBLICAN PAC,
              *Intervenor-Appellee.*

———————

On Appeal from the United States District Court
for the District of Columbia, No. 1:21-cv-2128-RJL
Before the Honorable Richard J. Leon

---

**APPELLANT'S BRIEF**

---

Adav Noti
Kevin P. Hancock
Alexandra Copper*
Allison Walter
CAMPAIGN LEGAL CENTER ACTION
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
khancock@campaignlegalcenter.org

*Counsel for Appellant*

*\* Not a member of the D.C. Bar; practicing
before the federal courts pursuant to D.C.
App. Rule 49(c)(3)*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Appellant End Citizens United PAC ("End Citizens United") submits its Certificate as to Parties, Rulings, and Related Cases.

**(A) Parties and Amici.** End Citizens United is the plaintiff in the district court and Appellant in this Court. Pursuant to Circuit Rule 26.1, End Citizens United certifies that it has no parent companies and no publicly held company with a 10% or greater ownership interest. End Citizens United is a political action committee whose mission is to get big money out of politics and protect the right to vote by working to elect reform-oriented politicians, pass meaningful legislative reforms, and elevate electoral issues in the national conversation.

The Federal Election Commission is the defendant in the district court but defaulted and has not appeared in the district court or in this Court. New Republican PAC ("New Republican") was granted leave by the district court to intervene in the action as a defendant and is an Appellee in this Court.

**(B) Rulings Under Review.** End Citizens United appeals the September 16, 2022 memorandum opinion (Doc. 36) and order (Doc. 37) of the U.S. District Court for the District of Columbia (Leon, J.) granting New Republican's Cross-Motion for Summary Judgment and denying End Citizens United's Motion for Default Judgment, or, in the Alternative, for Summary Judgment. The September 16, 2022

opinion is not published in the federal reporter but is available at 2022 WL 4289654 and can be found in the Joint Appendix at JA097-113.

**(C) Related Cases.** The appealed ruling has not previously been before this Court or any other court. There are no related cases pending before this Court or any other court of which counsel is aware.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................vi

GLOSSARY OF ABBREVIATIONS ......................................................x

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ........................................................4

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE ..............................................................6

    I.  Statutory and Regulatory Background ...........................................6

        A.  FECA's Source and Amount Restrictions ...............................6

        B.  FECA's Soft-Money Ban..................................................7

        C.  The Prohibition on Super PAC Contributions to Candidates ...................7

        D.  Candidacy.......................................................................8

        E.  The Statutory Framework for FEC Administrative Complaints.............10

    II. Statement of Facts.......................................................................11

        A.  Scott Chairs New Republican, Which Then Supports His Senate Candidacy.......................................................................11

        B.  End Citizens United Files Two Administrative Complaints..................15

        C.  The FEC's General Counsel Recommends Finding Reason to Believe and Investigating the Complaints..........................................16

        D.  The Commission Deadlocks 3-3 and Then Votes to Dismiss End Citizens United's Claims.........................................................17

    III. Procedural History....................................................................19

SUMMARY OF ARGUMENT ............................................................20

STANDARD OF REVIEW .................................................................22

ARGUMENT ...................................................................................23

iv

I.  The District Court Erred in Finding that It Lacked Subject-Matter Jurisdiction to Review the FEC's Dismissal of MUR 7370..........................23

A.  Reviewability Under FECA Is Not a Jurisdictional Issue .....................24

B.  The FEC's Dismissal of MUR 7370 Is Reviewable ..............................26

    1. The Controlling Commissioners Invoked Their Legal Analysis as Grounds for Exercising Prosecutorial Discretion ..............................27

    2. The District Court's Decision Rests on Precedent That Should Not Be Followed Because It Is Inconsistent with Fixed Law...................33

II. The District Court Erred in Finding the FEC's Dismissal of MUR 7496 Not Contrary to Law ...........................................................................35

A.  The FEC's Dismissal of MUR 7496 Was Contrary to Law ..................35

B.  The District Court Misinterpreted the Record Evidence and Disregarded the Controlling Commissioners' Clear Legal Errors .......................................................................................................41

    1. The District Court Disregarded the Controlling Commissioners Clear Legal Errors ...........................................................................41

    2. The District Court Misinterpreted the Record Evidence ...................44

CONCLUSION .....................................................................................................52

CERTIFICATE OF COMPLIANCE...................................................................54

CERTIFICATE OF SERVICE ............................................................................55

ADDENDUM .......................................................................................................56

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Akins v. FEC*, 101 F.3d 731 (D.C. Cir. 1996)........................................34

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...........................................................6

*Campaign Legal Center v. FEC*, 520 F. Supp. 3d 38 (D.D.C. 2021).......................7

*Campaign Legal Center v. FEC*, No. 19-2336 (JEB), --- F. Supp. 3d ----,
    2022 WL 17496220 (D.D.C. Dec. 8, 2022) ....................................................8, 36

*Campaign Legal Center & Democracy 21 v. FEC*,
    952 F.3d 352 (D.C. Cir. 2020)............................................. 20, 22, 23, 24, 25, 34

*Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) ..................34

*Citizens for Responsibility & Ethics in Washington v. American Action Network*,
    590 F. Supp. 3d 164 (D.D.C. Mar. 2, 2022) ......................................................26

*Citizens for Responsibility & Ethics in Washington v. FEC*,
    55 F.4th 918 (D.C. Cir. 2022)...........................................................21, 29, 30, 33

*Citizens for Responsibility & Ethics in Washington v. FEC*,
    892 F.3d 434 (D.C. Cir. 2018)....................................................................27, 33, 34

*Citizens for Responsibility & Ethics in Washington v. FEC*,
    993 F.3d 880 (D.C. Cir. 2021)................................................24, 26, 27, 32

*Common Cause v. FEC*, 842 F.2d 436 (D.C. Cir. 1988)...........................................10

*Democratic Congressional Campaign Committee v. FEC*,
    831 F.2d 1131 (D.C. Cir. 1987)............................................................34

*End Citizens United PAC v. FEC*, No. 21-1665 (TJK), 2022 WL 1136062
    (D.D.C. Apr. 18, 2022) ........................................................................26

*FEC v. Akins*, 524 U.S. 11 (1998).................................................................34

*Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348 (D.C. Cir. 2018) ...................23

*Heckler v. Chaney*, 470 U.S. 821 (1985) ......................................................17, 18, 33

*LaBotz v. FEC*, 889 F. Supp. 2d 51 (D.D.C. 2012) ..............................................50

*Motor Vehicle Manufacturers Association of the U.S. v. State Farm Mutual
    Automobile Insurance Co.*, 463 U.S. 29 (1983) ............................................38, 39

*Orloski v. FEC*, 795 F.2d 156 (D.C. Cir. 1986)..............................11, 22, 34, 39, 41

*Oryszak v. Sullivan*, 576 F.3d 522 (D.C. Cir. 2009)...........................................24, 25

*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015) ......................................................24

*Republican Party of Louisiana v. FEC*, 219 F. Supp. 3d 86 (D.D.C. 2016) .........6, 7

*Robertson v. FEC*, 45 F.3d 486 (D.C. Cir. 1995) ...............................................38

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011) ....................................24, 34

*Stop This Insanity Inc. Employee Leadership Fund v. FEC*, 761 F.3d 10 (D.C. Cir. 2014)...................................................................8

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ..............................................24, 25

**Statutes**

28 U.S.C. § 1291 .........................................................................................4

28 U.S.C. § 1331 ............................................................................4, 20, 24

52 U.S.C. § 30101(2) .................................................................................9

52 U.S.C. § 30101(4)(A) ...........................................................................6

52 U.S.C. § 30101(8)(A)(i) ........................................................................6

52 U.S.C. § 30102(e)(1) .........................................................................8, 15

52 U.S.C. § 30103(a) ..............................................................................8, 15

52 U.S.C. § 30104 .....................................................................................15

52 U.S.C. § 30104(a) ..................................................................................8

52 U.S.C. § 30106(c) .................................................................................10

52 U.S.C. § 30107(a)(6) ............................................................................11

52 U.S.C. § 30109(a)(1) ............................................................................10

52 U.S.C. § 30109(a)(2).......................................................................10, 17, 45

52 U.S.C. § 30109(a)(3).............................................................................10

52 U.S.C. § 30109(a)(4).............................................................................10

52 U.S.C. § 30109(a)(5).............................................................................10

52 U.S.C. § 30109(a)(6) ......................................................................10

52 U.S.C. § 30109(a)(8) ......................................................................11

52 U.S.C. § 30109(a)(8)(A) ...................................................................4

52 U.S.C. § 30109(a)(8)(C) ............................................................11, 34

52 U.S.C. § 30109(a)(9) .........................................................................4

52 U.S.C. § 30116(a)(1)(A) ...................................................................6

52 U.S.C. § 30116(a)(1)(C) ...................................................................6

52 U.S.C. § 30116(a)(2)(A) ...................................................................6

52 U.S.C. § 30116(f) ..............................................................................8

52 U.S.C. § 30118 ..................................................................................6

52 U.S.C. § 30118(a) ..............................................................................8

52 U.S.C. § 30125(e) ............................................................................15

52 U.S.C. § 30125(e)(1) .........................................................................7

**Legislative and Regulatory Authorities**

Fed. R. Civ. P. 56(a) ............................................................................23

11 C.F.R. § 100.72(b) ...............................................................9, 29, 30

11 C.F.R. § 100.131(b) .........................................................................29

11 C.F.R. § 101.1(a) ...............................................................................8

11 C.F.R. § 109.21(a) .....................................................................36, 46

11 C.F.R. § 109.21(a)(1) ......................................................................36

11 C.F.R. § 109.21(a)(2) ......................................................................36

11 C.F.R. § 109.21(a)(3) ......................................................................37

11 C.F.R. § 109.21(c)(3) ......................................................................36

11 C.F.R. § 109.21(d)(1) ......................................................................37

11 C.F.R. § 109.21(d)(3) ......................................................................37

11 C.F.R. § 300.2(c)(2) ..........................................................................7

**Other Authorities**

FEC Advisory Op. 2015-09 (Senate Maj. PAC, *et al.*) (Nov. 13, 2015),
   https://www.fec.gov/files/legal/aos/2015-09/2015-09.pdf.......................9, 29, 30

FEC Advisory Op. 2017-10 (Citizens Against Plutocracy)
   (Sept. 20, 2017), https://www.fec.gov/files/legal/aos/83518.pdf........................8

Factual and Legal Analysis, MUR 5363 (Sharpton *et al.*) (Nov. 13, 2003),
   https://eqs.fec.gov/eqsdocsMUR/000007F9.pdf ............................................9, 29

FEC, Statement of Policy Regarding Commission Action in Matters at
   the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12,545
   (Mar. 16, 2007) ......................................................................................10, 35, 45

FEC, Office of the General Counsel, OGC Enforcement Manual (2013),
   https://www.fec.gov/resources/updates/agendas/2013/mtgdoc_13-
   21.pdf .................................................................................................................46

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **CREW** | Citizens for Responsibility and Ethics in Washington |
| **FEC** | Federal Election Commission |
| **FECA** | Federal Election Campaign Act |
| **MUR** | Matter Under Review |
| **PAC** | Political Committee |

## INTRODUCTION

This case involves the Federal Election Commission's ("FEC" or "Commission") unlawful dismissal of Appellant End Citizens United PAC's ("End Citizens United") administrative complaints alleging that U.S. Senator Rick Scott, his campaign, and New Republican PAC ("New Republican") violated federal campaign finance law.

To limit the risk and appearance of *quid pro quo* corruption, the Federal Election Campaign Act ("FECA" or the "Act") restricts the sources and amounts of contributions to federal candidates. FECA also requires candidates to file periodic financial disclosure reports that inform the electorate of who is spending money to influence their votes.

Starting in 2017, Scott's nascent Senate campaign engaged in a blatant scheme to circumvent these important anti-corruption and pro-transparency laws. Scott illegally delayed declaring his candidacy with the FEC to avoid triggering FECA's requirements, while co-opting New Republican, a super PAC, to raise millions of dollars outside the Act's limits that would later be spent supporting his campaign. In May 2017 when Scott became Chair of New Republican, the super PAC had made no independent expenditures since 2014 and had not received a contribution in over a year. Scott quickly staffed the super PAC with his political

1

allies, declared a new mission to support then-President Trump's policies while rebranding the Republican Party, and ramped up operations, raising over a million dollars by the end of 2017 and a further $1.2 million in the first quarter of 2018. Yet the super PAC did not spend any of that money on its purported new mission. While Scott was Chair, New Republican continued to make no independent expenditures in support of any candidates, and it aired no issue ads. That changed when Scott announced his Senate campaign in April 2018. The day of Scott's announcement, New Republican rolled out a new website—prepared and paid for in advance—and a new objective: electing Rick Scott. New Republican then spent millions on that objective in the 2018 election, almost all either in support of Scott or in opposition to Bill Nelson, his Democratic rival.

End Citizens United filed two administrative complaints with the FEC, documenting how Scott, his principal campaign committee, Rick Scott for Florida (the "Scott Campaign"), and New Republican had violated the Act by failing to timely file a Statement of Candidacy and other required organizational and financial disclosures, accepting funds that did not comply with FECA's contribution restrictions and disclosure requirements, and making or accepting unlawful excessive contributions in the form of coordinated communications.

Despite the voluminous record evidence supporting End Citizens United's claims, three FEC Commissioners ("the controlling Commissioners") voted—contrary to the recommendation of the agency's General Counsel—to dismiss the complaints. Some portions of the dismissal relied on a purported invocation of the FEC's prosecutorial discretion, while other parts were explained only in one cursory (and legally erroneous) footnote.

Pursuant to FECA's judicial review provision, End Citizens United filed this suit, arguing that the FEC's dismissals of its complaints were contrary to law because the administrative record provided ample evidence to establish reason to believe that the violations occurred and because the Commissioners' explanation for dismissing each claim was woefully deficient.

The district court affirmed the dismissals, relying on misunderstandings of applicable law—including this Court's case law governing the invocation of prosecutorial discretion—and erroneous characterizations of the Commission's actions. The district court erred in concluding that it lacked subject-matter jurisdiction to review one of the FEC's dismissals, as this Court has stated that reviewability of FEC dismissals is not a jurisdictional issue. The court also erred by finding the Commissioners' invocation of prosecutorial discretion unreviewable even though that invocation was premised on the Commissioners' erroneous legal

interpretation (which is subject to review). Further, in finding that the Commission's dismissal of End Citizens United's coordination claims was not contrary to law, the district court relied on a material misunderstanding of FECA's requirements for a successful coordination claim. The district court also failed to correctly analyze the substance of that claim.

Appellant End Citizens United asks this Court to reverse the district court's erroneous decision.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal from a final order of the U.S. District Court for the District of Columbia under 28 U.S.C. § 1291 and 52 U.S.C. § 30109(a)(9). Despite the district court's conclusion otherwise, the district court had subject-matter jurisdiction over the case under 28 U.S.C. § 1331 and 52 U.S.C. § 30109(a)(8)(A). End Citizens United timely filed this appeal on October 17, 2022, within sixty days of the district court's memorandum opinion and order entered September 16, 2022, which disposed of all of End Citizens United's claims in this action.

## STATEMENT OF THE ISSUES

1.     Under FECA, reviewability of an FEC dismissal of an administrative complaint is not a jurisdictional issue, even when the controlling Commissioners have invoked the agency's prosecutorial discretion as a basis for dismissal. The

4

district court concluded that, because the controlling Commissioners' Statement of Reasons purported to exercise the agency's prosecutorial discretion to dismiss End Citizens United's claims in Matter Under Review ("MUR") 7370, the court lacked subject-matter jurisdiction to review that dismissal. Did the district court err in concluding that it lacked subject-matter jurisdiction to review the FEC's dismissal of MUR 7370?

2.    An FEC dismissal is reviewable where the controlling Commissioners referenced their merits analysis as a ground for exercising prosecutorial discretion. The controlling Commissioners who voted to dismiss MUR 7370 referenced their interpretation of the FEC's test for when an individual becomes a candidate under the Act as the basis for their purported exercise of the agency's prosecutorial discretion. Did the district court err in concluding that the controlling Commissioners' invocation of prosecutorial discretion rendered the dismissal of MUR 7370 unreviewable?

3.    An FEC dismissal is contrary to law where the agency fails to adequately explain the rationale for its decision or bases its decision on an impermissible interpretation of law. The controlling Commissioners explained their decision to dismiss MUR 7496's coordination claims in one footnote of an 11-page single-spaced, 53-footnote statement, which erroneously claims that the merits of the coordination claims depended on the success of unrelated claims. Did the district

5

court err in concluding that the dismissal of MUR 7496 was not contrary to law?

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background

#### A.    FECA's Source and Amount Restrictions

Congress enacted FECA in part to "limit the actuality and appearance of corruption resulting from large individual financial contributions." *Buckley v. Valeo*, 424 U.S. 1, 26 (1976) (per curiam). To do so, FECA restricts the sources and amounts of contributions made "for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). As relevant here, individuals may contribute no more than $2,900 per election to a federal candidate, and $5,000 per year to a political committee. *Id.* § 30116(a)(1)(A), (C). A political committee (also known as a "PAC") is any group of persons whose major purpose is the nomination or election of a federal candidate and that has contributed or spent at least $1,000 to influence a federal election. *Id.* § 30101(4)(A). Political committees generally may contribute no more than $5,000 per election to a candidate. *Id.* § 30116(a)(2)(A). And corporations are prohibited from contributing any amount to federal candidates and most political committees. *Id.* § 30118. Money subject to FECA's limits is often called "hard money" or "federal funds." *Republican Party of La. v. FEC*, 219 F. Supp. 3d 86, 89-90 (D.D.C. 2016).

6

### B.     FECA's Soft-Money Ban

FECA reinforces its hard money limits by specifically prohibiting candidates from raising and spending money that is not restricted by FECA's limits, which is often called "soft money" or "nonfederal funds." *Republican Party of La.*, 219 F. Supp. 3d at 89-90. Under this so-called "soft-money ban," candidates may not "solicit, receive, direct, transfer, or spend funds in connection with [a federal] election . . . unless the funds are subject to the [Act's] limitations, prohibitions, and reporting requirements." 52 U.S.C. § 30125(e)(1). The soft-money ban also applies to a candidate's agents and any entity (including any political committee) "directly or indirectly established, financed, maintained, or controlled by or acting on behalf of" a candidate. *Id.* "To determine whether a [candidate] directly or indirectly established, finances, maintains, or controls an entity" under § 30125(e)(1), the Commission considers ten non-exhaustive factors "in the context of the overall relationship between the [candidate] and the entity." 11 C.F.R. § 300.2(c)(2).

### C.     The Prohibition on Super PAC Contributions to Candidates

A "super PAC" is a type of political committee that is permitted to raise and spend soft money, but only so long as the super PAC does not contribute to federal candidates (who are subject to FECA's limits). *Campaign Legal Ctr. v. FEC*, 520 F. Supp. 3d 38, 43 (D.D.C. 2021). This prohibition on super PAC contributions to

candidates extends to "coordinated communications," which are a type of coordinated expenditure that qualifies as an in-kind contribution under FECA. *See Campaign Legal Ctr. v. FEC*, No. 19-2336 (JEB), --- F. Supp. 3d ----, 2022 WL 17496220, at *1 (D.D.C. Dec. 8, 2022); FEC Advisory Op. 2017-10 at 2 (Citizens Against Plutocracy) (Sept. 20, 2017), https://www.fec.gov/files/legal/aos/83518.pdf. Candidates may not knowingly accept excessive or otherwise prohibited contributions from super PACs. *See* 52 U.S.C. §§ 30116(f), 30118(a).

### D.    Candidacy

FECA imposes various fundraising limits and disclosure requirements after an individual becomes a "candidate" under the Act. Upon becoming a "candidate," an individual must file a Statement of Candidacy that designates her principal campaign committee within fifteen days. 52 U.S.C. § 30102(e)(1); 11 C.F.R. § 101.1(a). That committee, in turn, has ten days from its designation to file a Statement of Organization, 52 U.S.C. § 30103(a), and must thereafter file regular disclosure reports with the FEC, 52 U.S.C. § 30104(a); 11 C.F.R. § 104.1(a). These disclosure reports are important because they inform the electorate about sources of political speech. *See, e.g.*, *Stop This Insanity Inc. Emp. Leadership Fund v. FEC*, 761 F.3d 10, 16 (D.C. Cir. 2014) (emphasizing the "First Amendment rights of the public to know the identity of those who seek to influence their vote").

8

Under FECA, a "candidate" is "an individual who seeks nomination for election, or election to Federal office"; that status is triggered when an individual (or their agent) accepts or spends more than $5,000 for the purpose of influencing a federal election. 52 U.S.C. § 30101(2). While the Commission's "testing the waters" exemptions allow an individual to raise and spend more than $5,000 without becoming a candidate if that money is used solely to assess whether to commit to a possible run, those exemptions are unavailable to an individual who has already decided to become a candidate. *See* 11 C.F.R. §§ 100.72(b), .131(b). FEC regulations establish an objective inquiry to determine whether an individual has become a candidate. *See id.* §§ 100.72(b), .131(b); FEC Advisory Op. 2015-09 at 6 (Senate Maj. PAC, *et al.*) (Nov. 13, 2015), https://www.fec.gov/files/legal/aos/2015-09/2015-09.pdf; Factual and Legal Analysis at 7-8, MUR 5363 (Sharpton *et al.*) (Nov. 13, 2003), https://eqs.fec.gov/eqsdocsMUR/000007F9.pdf. As part of that inquiry, the FEC considers a non-exhaustive list of "activities that indicate that an individual has decided to become a candidate." 11 C.F.R. §§ 100.72(b), .131(b)*.* Among these activities is "rais[ing] funds in excess of what could reasonably be expected to be used for exploratory activities or undertak[ing] activities designed to amass campaign funds that would be spent after he or she becomes a candidate." *Id.* §§ 100.72(b)(2), .131(b)(2).

9

### E.     The Statutory Framework for FEC Administrative Complaints

Any person may file a complaint with the Commission alleging a violation of FECA. 52 U.S.C. § 30109(a)(1). Based on the complaint and the FEC General Counsel's recommendations, the Commission then votes on whether to find "reason to believe" that the subject of the complaint committed a violation. *Id.* § 30109(a)(2). A decision to find reason to believe, which requires four affirmative votes, does not trigger any penalties; rather, it initiates an investigation by the FEC. *See id.*; FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12,545, 12,545 (Mar. 16, 2007) (reason to believe requires that "the available evidence . . . is at least sufficient to warrant conducting an investigation").

Following a reason-to-believe investigation, and after considering input from the agency's General Counsel and the complaint's respondent, the FEC determines whether there is "probable cause to believe that [the respondent] has committed . . . a [FECA] violation." 52 § 30109(a)(3)-(4). If four Commissioners vote to find probable cause, the agency may seek civil penalties either through a conciliation agreement with the respondent or in federal court. *Id.* § 30109(a)(4)-(6).

At any stage of its enforcement proceedings, the agency may vote to dismiss the complaint. *See, e.g.*, *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988).

"Any party aggrieved" by dismissal of its complaint may seek review in the District Court for the District of Columbia. 52 U.S.C. § 30109(a)(8). For the FEC to defend such a lawsuit, at least four Commissioners must vote to authorize the defense. *See* 52 U.S.C. §§ 30106(c), 30107(a)(6). The court "may declare that the dismissal . . . is contrary to law, and may direct the Commission to conform with such declaration within 30 days." 52 U.S.C. § 30109(a)(8). A dismissal is contrary to law "if (1) the FEC dismissed the complaint as a result of an impermissible interpretation of the Act, or (2) if the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion." *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986) (citations omitted).

Should the agency fail to comply with an order directing it to conform, "the complainant may bring . . . a civil action to remedy the violation." 52 § 30109(a)(8)(C).

## II.    Statement of Facts

### A.    Scott Chairs New Republican, Which Then Supports His Senate Candidacy

New Republican is a super PAC that registered with the FEC on May 8, 2013. *See* JA163, 212. The organization's stated purpose at its founding was "to advance . . . ideas of what the next generation of Republicans . . . should represent" and support candidates who fit the "New Republican" model. JA163. The committee was active

during the 2013-2014 election cycle, but it made no independent expenditures during the 2015-2016 cycle and, by May 2017, had not received any contributions in over a year. JA212-13.

In May 2017, Rick Scott, then Governor of Florida, became Chair of New Republican. JA124. Upon joining the super PAC, Scott hired a number of political allies to fill key roles, including his former chief of staff and campaign manager, Melissa Stone, who was hired as New Republican's executive director. JA124. New Republican also contracted with Stone's consulting firm, brought on a Scott administration appointee as finance director, and retained Scott's longtime fundraiser, along with other consultants who had previously worked on Scott's campaigns. JA119, 124, 126, 130, 213. The super PAC further revised its stated mission to include "rebrand[ing] the way the Republican Party approaches the challenges of the future" and supporting President Trump. JA124, 213.

Although Scott himself had not publicly declared his candidacy in Florida's 2018 Senate election when he joined New Republican, media reports at the time indicated that "political strategists in both parties viewed New Republican 'as a vehicle to raise money ahead of Scott's anticipated bid to unseat Democratic U.S. Sen. Bill Nelson in 2018.'" JA138, 213-14. A former Scott spokesman explained that "[h]e is running for Senate. That's all this is about." JA138.

12

After Scott's hiring, New Republican greatly expanded its fundraising, taking in more than $275,000 during Scott's first three weeks, nearly $1.2 million by the end of 2017, and a further $1.2 million in the first quarter of 2018. JA118, 125, 214. These contributions included both corporate and unlimited contributions. JA214. Still, New Republican did not increase its spending: under Scott, the organization continued to make no independent expenditures in support of any candidates, and it aired no issue ads. JA214.

Scott claimed to have stepped down from his role with New Republican in December 2017. JA153. But the super PAC's website identified him as Chair until at least January 18, 2018. JA215, 227. In addition, a spokesman for the Scott Campaign, in April 2018, indicated that Scott had remained with New Republican until February 2018, JA215-16, 227, and media reports identified him as Chair as late as March 3, 2018, JA176, 215-16. Scott also remained involved in the organization's fundraising well into 2018. On March 3, he was a "featured guest" at a New Republican fundraiser in his own home, JA136, 153, 216, and he participated in a conference call with the super PAC's donors on August 29, JA214, 217. Scott allies also remained with the organization after his ostensible departure. *See* JA167, 215.

13

After Scott stepped down as Chair—but before he publicly declared his Senate candidacy—New Republican commissioned and paid for a poll testing Scott's competitiveness against Bill Nelson, the Democratic incumbent (the only such poll the super PAC commissioned for any candidate). JA146-47, 168, 172 ¶ 6, 217. The poll was commissioned on March 1 or 2, conducted between March 10 and 13, and paid for on March 14. *Id.* Scott did not publicly declare his candidacy in Florida's 2018 Senate election until April 9. JA153. He filed his Statement of Candidacy with the FEC on April 8, 2018, and his campaign submitted a Statement of Organization on April 10 and began filing disclosure reports later that year. JA153. The Scott Campaign's first disclosure report listed testing-the-waters expenses of over $166,500 beginning in January 2018 but did not reveal any earlier contributions or expenditures, or the poll testing by New Republican. JA210-11.

On April 9—the same day Scott announced his Senate run—New Republican updated its website and mission statement to support his candidacy. JA120, 217, 223. In a press release, the super PAC announced its new "focus[] on the election of Rick Scott," JA143, 217, while the revamped website—designed in February and paid for in March, *before* Scott publicly declared—included such features as an "About Rick" page and details on Scott's political positions, JA120, 147, 168, 223.

14

Less than a month later, on May 3, New Republican released a television advertisement attacking Nelson, thereby expressly supporting Scott's candidacy. JA177, 185. The super PAC launched another advertisement for television and social media on June 11, calling on voters to "Term Limit Career Politician Bill Nelson." JA177, 185. Ultimately, between May and November 2018, New Republican made over $30.5 million in independent expenditures, more than $29.5 million of which were in support of Scott or in opposition to Nelson. JA218.

### B.    End Citizens United Files Two Administrative Complaints

Drawing on publicly available information about Scott's relationship with New Republican, End Citizens United filed two administrative complaints alleging several distinct violations of FECA by Scott, his campaign, and New Republican. In its first complaint, filed on April 10, 2018, and supplemented on April 17, End Citizens United asked the Commission to find reason to believe that (1) Scott had failed to timely file a Statement of Candidacy (the "candidacy-filing claim") under 52 U.S.C. § 30102(e)(1); (2) the Scott Campaign had failed to timely file a Statement of Organization (the "organization-filing claim") under 52 U.S.C. § 30103(a); (3) the Scott Campaign had failed to submit required financial disclosures (the "nondisclosure claim") under 52 U.S.C. § 30104; (4) Scott violated the soft-money ban of 52 U.S.C. § 30125(e); and (5) New Republican violated the soft-money ban.

15

JA120-22. The FEC designated the matter initiated by this complaint as MUR 7370. JA118.

End Citizens United's second complaint, filed on September 5, 2018, asked the Commission to find reason to believe that the advertisements run by New Republican in May and June of 2018 had been made in coordination with Scott and his campaign, such that New Republican made, and Scott and his campaign accepted, unlawful in-kind contributions (the "coordination claims"). JA178-82. The FEC designated the matter initiated by this second complaint as MUR 7496. JA175.

### C.    The FEC's General Counsel Recommends Finding Reason to Believe and Investigating the Complaints

Based on End Citizens United's administrative complaints; written responses by Scott, his campaign, and New Republican; and all other available evidence, the FEC's General Counsel recommended that the Commission find reason to believe the respondents had broken the law as alleged in the candidacy-filing claim, the organization-filing claim, the nondisclosure claim, and the soft-money ban claim against New Republican. JA210. Because investigating these claims could reveal information material to End Citizens United's remaining claims, the General Counsel further recommended that the Commission "take no action at this time" on the soft-money ban claim against Scott and the coordination claims against Scott, the Scott Campaign, and New Republican. JA210, 229-30, 232-33.

16

The General Counsel based her reason-to-believe recommendations on two primary conclusions. First, "the available information indicate[d] that Scott became a federal candidate as early as 2017 because, as Chair of New Republican, he undertook activities designed to amass funds that were to be spent on supporting his Senate candidacy after he declared such candidacy in April 2018." JA221. Second, in light of this determination, "the available information supports a reasonable inference that Scott controlled New Republican and that New Republican and Scott were thus subject to the Act's soft money prohibitions from the time that Scott became a federal candidate." JA226.

### D. The Commission Deadlocks 3-3 and Then Votes to Dismiss End Citizens United's Claims

On May 20, 2021, the FEC deadlocked 3-3 on a motion to approve the General Counsel's recommendations. JA270-71. The motion failed because approving a reason-to-believe finding requires four affirmative votes. 52 U.S.C. § 30109(a)(2).

On June 10, the Commission, also by a 3-3 vote, declined to dismiss, under *Heckler v. Chaney*, 470 U.S. 821 (1985), the candidacy-filing, organization-filing, and nondisclosure claims. JA272. By the same margin, the FEC rejected a motion to find no reason to believe that New Republican violated the soft-money ban and to dismiss the remainder of the allegations. JA272-73. In light of these deadlocks, the

17

FEC then voted 5-1 to "[c]lose the file" on Appellant's administrative complaints, thereby dismissing them. JA273.

Two of the three Commissioners who voted to approve the General Counsel's recommendations issued a Statement of Reasons on July 15, explaining their votes and criticizing the FEC's failure to pursue End Citizens United's "well-supported allegations." JA274-80.

Subsequently, on July 21, the three Commissioners who voted to reject the General Counsel's recommendations issued a Statement of Reasons (the "Statement") purporting to explain the basis for their decisions. JA281-91. The Statement indicated that the controlling Commissioners had concluded there was no reason to believe that New Republican had violated the soft-money ban, and further claimed that they had "dismissed the allegations that Scott untimely filed his candidacy and organization paperwork under *Heckler v. Chaney*." JA282. The controlling Commissioners then dismissed the remaining claims—the coordination claims and Scott's soft-money violations—asserting that "[a]ll of those allegations would have required, at a minimum, a threshold finding that Scott had failed to file a statement of candidacy at the appropriate time or that New Republican had violated the soft money rules." JA282 n.2.

18

## III.  Procedural History

End Citizens United filed this action in the district court on August 9, 2021, challenging the FEC's dismissal of its administrative complaints as contrary to law. Compl., ECF No. 1. The Commission failed to appear, plead, or otherwise defend the action, and the Clerk of Court entered a certificate of default against the agency on November 2, 2021. *See* ECF No. 12. Prior to that default, on October 15, 2021, New Republican moved to intervene as a defendant, filing a proposed answer and motion to dismiss. *See* ECF Nos. 9, 14-15, 22. The district court granted New Republican's motion to intervene. *See* Minute Order (Nov. 2, 2021). End Citizens United then filed a motion for default judgment or, in the alternative, summary judgment. *See* ECF No. 23. New Republican filed a cross motion for summary judgment. *See* ECF No. 27.

On September 16, 2022, the district court granted summary judgment for New Republican, denied End Citizens United's motion for default judgment or summary judgment, and denied New Republican's motion to dismiss as moot. *See* JA97-113. The court concluded that it lacked jurisdiction to review the FEC's dismissal of MUR 7370—regarding the candidacy-filing, organization-filing, nondisclosure, and soft-money claims—because the Commission invoked prosecutorial discretion to dismiss the complaint. *See* JA107-10. The court further concluded that the FEC's

19

dismissal of MUR 7496—regarding the coordination claims—was not contrary to law. *See* JA110-13.

## SUMMARY OF ARGUMENT

The Court should reverse the district court's ruling because it rests on a series of legal errors.

*First*, the district court erred in concluding that it lacked subject-matter jurisdiction to review the FEC's dismissal of MUR 7370. Under FECA, "reviewability is not a jurisdictional issue," even when the controlling Commissioners have invoked the agency's prosecutorial discretion as a basis for dismissal. *Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020) (per curiam) [hereinafter "*Democracy 21*"]. Because the Administrative Procedure Act ("APA") does not grant or confer jurisdiction, the court retains jurisdiction under 28 U.S.C. § 1331 to review agency action, even where that action is unreviewable under the APA because it is committed to agency discretion by law. Accordingly, the district court erred in holding that the controlling Commissioners' purported invocation of prosecutorial discretion in their dismissal of MUR 7370 eliminated the court's subject-matter jurisdiction.

*Second*, even if FECA reviewability were a jurisdictional issue, which it is not, the district court erred in finding that it lacked jurisdiction because the FEC's

20

dismissal of MUR 7370 is reviewable. The district court concluded that the controlling Commissioners' invocation of prosecutorial discretion acted as "an absolute bar" to reviewability. *See* JA106. But while FEC dismissals based on prosecutorial discretion are sometimes unreviewable, a dismissal is reviewable where the controlling Commissioners "reference[d] their merits analysis as a ground for exercising prosecutorial discretion." *Citizens for Responsibility & Ethics in Washington* [("*CREW*")] *v. FEC*, 55 F.4th 918, 920-21 (D.C. Cir. 2022) [hereinafter "*New Models II*"] (Rao, J., concurring in denial of reh'g en banc).[1] Such is the case here, where the controlling Commissioners rested their purported invocation of prosecutorial discretion squarely on their (erroneous) legal conclusion that determining when Scott became a candidate under FECA would require "prob[ing] his subjective intent." JA290. Accordingly, the district court erred in concluding that the invocation of prosecutorial discretion rendered the dismissal unreviewable, as the Statement of Reasons makes clear that the controlling Commissioners' interpretation of FECA and FEC regulations underlies all their justifications for employing the agency's discretion.

---

[1]     To differentiate between cases brought by Citizens for Responsibility and Ethics in Washington against the FEC, this brief refers to each case by the name of the respondent in the underlying administrative matter.

*Third*, the district court erred in finding the FEC's dismissal of MUR 7496 (concerning the coordination claims) not contrary to law. The FEC's "reason to believe" standard sets a low bar, and the administrative record provided ample reason for the FEC to investigate whether Scott, his campaign, and New Republican coordinated a pair of advertisements aired by the super PAC in May and June 2018, resulting in unlawful contributions from New Republican to the Scott Campaign. *See, e.g.*, JA177, 185. Disregarding the evidence, the controlling Commissioners: (1) dismissed the coordination claims without engaging with the merits of those claims, *see* JA281-82 nn.1 & 2; and (2) based their decision on a blatantly "impermissible interpretation" of FECA, *Orloski*, 795 F.2d at 161, namely that the fate of the coordination claims depended on the merits of the candidacy-filing and soft-money claims, *see* JA282 n.2. The district court, nevertheless, found the dismissal of MUR 7496 reasonable, *see* JA110-13; in so doing, it disregarded and misinterpreted the record evidence, and endorsed, rather than corrected, the controlling Commissioners' clear legal errors.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *See, e.g.*, *Democracy 21*, 952 F.3d at 356. Summary judgment is only appropriate where

22

"the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Moreover, although this Court reviews the decision whether to grant a default judgment for abuse of discretion, "a district court . . . necessarily abuses its discretion if it bases its ruling on an error of law" or "a clearly erroneous assessment of the evidence." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (cleaned up).

## ARGUMENT

### I.     The District Court Erred in Finding that It Lacked Subject-Matter Jurisdiction to Review the FEC's Dismissal of MUR 7370

The district court erred in concluding that it lacked subject-matter jurisdiction to review the FEC's dismissal of MUR 7370, concerning the candidacy-filing, organization-filing, nondisclosure, and soft-money claims. The district court reasoned that because the controlling Commissioners' Statement purported to exercise the agency's prosecutorial discretion to dismiss those claims, the dismissal was unreviewable and, thus, the court lacked subject-matter jurisdiction. *See* JA107-10. But this analysis rests on two independent legal errors. First, the controlling Commissioners invocation of prosecutorial discretion in this case did not affect the district court's jurisdiction, because "reviewability [under FECA] is not a jurisdictional issue." *Democracy 21*, 952 F.3d at 355. Second, and in any case, the

23

controlling Commissioners' invocation of prosecutorial discretion did not render the dismissal of MUR 7370 unreviewable.

## A.    Reviewability Under FECA Is Not a Jurisdictional Issue

Contrary to the district court's assertion, *see* JA107, the controlling Commissioners invocation of the agency's prosecutorial discretion did not affect the district court's jurisdiction to adjudicate MUR 7370's claims.

The law is clear: under FECA, "reviewability is not a jurisdictional issue." *Democracy 21*, 952 F.3d at 355 (citing *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1097-98 (D.C. Cir. 2015)). This Court has explained that FEC dismissals independently based on prosecutorial discretion are unreviewable because, under APA § 701(a)(2), courts cannot question "agency action . . . committed to agency discretion by law." *CREW v. FEC*, 993 F.3d 880, 888 (D.C. Cir. 2021) [hereinafter "*New Models*"]. Nevertheless, a court retains jurisdiction over a challenge to such agency action under 28 U.S.C. § 1331 because "Section 701(a)(2) of the APA is not . . . a jurisdictional bar." *People for the Ethical Treatment of Animals*, 797 F.3d at 1097 (citation omitted); *see also Oryszak v. Sullivan*, 576 F.3d 522, 524 (D.C. Cir. 2009) ("[W]e conclude [that APA § 701(a)(2)] is not a jurisdictional bar."); *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006) ("[T]he APA neither confers nor restricts jurisdiction."); *Sierra Club v.*

24

*Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) ("Applying *Oryszak* and *Trudeau*, we conclude that a complaint seeking review [under APA] § 701(a)(2), . . . should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1).").

In *Democracy 21*, for example, the controlling Commissioners who voted not to pursue a group of administrative complaints cited, among other reasons for their decision, the Commission's prosecutorial discretion. *See* 952 F.3d at 355. The agency argued that this invocation of prosecutorial discretion rendered the dismissals unreviewable, which the plaintiffs disputed. *See id.* at 356. But the court declined to address the reviewability question, stating that it was not jurisdictional, and instead decided the plaintiffs' contrary-to-law claims on the merits—a choice the court could not have made if the controlling Commissioners' invocation of prosecutorial discretion disposed of its underlying jurisdiction. *See id.* at 356-57.

The district court was therefore incorrect when it concluded that "the FEC's reliance on prosecutorial discretion . . . , even in part, divests a reviewing court of jurisdiction." JA107. The district court relied on *New Models* for that proposition, *id.*, but that reliance is misplaced. At no point did *New Models* describe FECA reviewability as a jurisdictional issue; indeed, even though the Court concluded that an FEC dismissal was unreviewable, it affirmed a grant a summary judgment, rather

than dismissing for lack of subject-matter jurisdiction. *See* 993 F.3d at 895. Other than *New Models*, the court below relied on two district court opinions, neither of which support its ruling, and both of which have been appealed. *See* JA105 (citing *End Citizens United PAC v. FEC*, No. 21-1665 (TJK), 2022 WL 1136062, at *3 (D.D.C. Apr. 18, 2022), *appeal filed* June 23, 2022; *CREW v. Am. Action Network*, 590 F. Supp. 3d 164, 173-74 (D.D.C. Mar. 2, 2022), *appeal filed* Mar. 31, 2022).[2]

Under this Court's precedents, the district court erred in dismissing End Citizens United's claims for lack of subject-matter jurisdiction.

### B.    The FEC's Dismissal of MUR 7370 Is Reviewable

Even if FECA reviewability were a jurisdictional issue, the district court nevertheless had jurisdiction because the FEC's dismissal of MUR 7370 is reviewable.

The district court erred in concluding otherwise. It reasoned that, in the controlling Commissioners' Statement, "the FEC expressly exercised its prosecutorial discretion," and that this alleged exercise acted as "an absolute bar" to the district court's ability to review the dismissal. JA107-08 (cleaned up). Although

---

[2]    In *End Citizens United PAC* (No. 21-cv-1665), the district court mistakenly relied on two inapposite district court opinions not involving the FEC or FECA. *See* 2022 WL 1136062 at *3. In *American Action Network*, the district court never once said that it was dismissing the case for lack of jurisdiction. *See* 590 F. Supp. 3d at 165-75.

this Court has explained that FEC dismissals based on prosecutorial discretion are sometimes unreviewable, *see New Models*, 993 F.3d at 884-85*; CREW v. FEC*, 892 F.3d 434, 440-42 (D.C. Cir. 2018) [hereinafter "*Commission on Hope*"], the *CREW* decisions do not preclude review here.

### 1. The Controlling Commissioners Invoked Their Legal Analysis as Grounds for Exercising Prosecutorial Discretion

The district court erred by concluding that the dismissal of MUR 7370 was unreviewable because—as the court acknowledged, JA109—the controlling Commissioners referenced their interpretation of FECA as a basis for exercising prosecutorial discretion. The dismissal thus depended on the controlling Commissioners' legal analysis, which this Court has held is subject to contrary-to-law review.

The FEC's decision to dismiss a claim is reviewable where that decision was made "on the basis of its interpretation of FECA." *Comm'n on Hope*, 892 F.3d at 441 n.11; *see also New Models*, 993 F.3d at 884. Although an FEC dismissal is unreviewable when it "rests even in part on prosecutorial discretion," *New Models*, 993 F.3d at 885, that is true only where prosecutorial discretion provides an independent basis for dismissal, distinct from any FECA interpretation. For example, in *New Models* the dismissal there "rested on two *distinct* grounds: the Commission's interpretation of FECA *and* its exercise of prosecutorial discretion."

27

*Id.* at 884 (cleaned up) (emphases added); *see also id.* at 887 (emphasizing that "prosecutorial discretion [had been] exercised *in addition to the legal grounds*" offered by the agency) (emphasis in original). Moreover, the agency's invocation of prosecutorial discretion was not premised on its interpretation of FECA, but instead "rested *squarely* on prudential and discretionary considerations relating to resource allegation and the likelihood of successful enforcement." *Id.* at 886 (emphasis added); *see also id.* (stressing that the FEC offered these considerations "in addition to its legal analysis of FECA's . . . requirements"). Because the invocation of prosecutorial discretion provided a separate "basis for dismissal," the Court explained, a ruling that the controlling Commissioners' interpretation of FECA was contrary to law would effectively be an advisory opinion that "would not affect the Commission's ultimate decision to dismiss." *Id.* at 889.

This point was recently reiterated and expounded upon by four members of this Court, including the author of the *New Models* decision, in an opinion concurring in the Court's denial of a petition to rehear *New Models* en banc. That opinion emphasized that an FEC dismissal is unreviewable where the statement of reasons specifies that the controlling Commissioners "relied on an *independent* ground of prosecutorial discretion," but not where those Commissioners "referenced their merits analysis as a ground for exercising prosecutorial discretion." *New*

28

*Models II*, 55 F.4th at 920-21 (Rao, J., concurring in denial of reh'g en banc) (cleaned up) (emphasis added).

Here, unlike in *New Models*, the controlling Commissioners rested their purported invocation of prosecutorial discretion on a legal conclusion about FECA: that determining when Scott became a candidate would require "prob[ing] his subjective intent." JA290. But the controlling Commissioners are wrong. Commission regulations and precedent make clear the objectivity of the candidacy inquiry: those rules examine whether the individual has engaged in "*activities that indicate* that [that] individual has decided to become a candidate." 11 C.F.R. §§ 100.72(b), 100.131(b) (emphasis added). As the General Counsel explained in this matter, under these regulations, "[t]he Commission . . . assesses an individual's objectively deliberate actions to discern whether and when an individual decided to become a candidate." JA221. While the "activities" listed in the testing-the-waters regulations may serve as proxies for an individual's subjective intent, the ultimate inquiry turns on whether the potential candidate has engaged in those activities—an objective fact—and not the individual's subjective state of mind. *See* FEC Advisory Op. 2015-09 at 5-6 (Senate Maj. PAC, et al.); Factual and Legal Analysis at 7-8, MUR 5363 (Sharpton et al.) (Nov. 13, 2003). Indeed, the controlling Commissioners themselves concede that the FEC's candidacy regulations identify indicia of

candidacy that "are fairly intuitive and objective." JA286 (citing 11 C.F.R. §§ 100.72(b)(2), 100.131).

Nevertheless, to reach its conclusion that the dismissal is unreviewable, the district court summarily endorsed the Statement's incorrect finding that it would be necessary to probe Scott's subjective intent. *See* JA109. In doing so, the district court mischaracterized End Citizens United's argument that the candidacy inquiry is determined by objective factors as claiming that "subjective intent is irrelevant" to candidacy, and misread FEC Advisory Opinion 2015-09 (Senate Maj. PAC, et al.). *See id.* While that opinion indicates that a subjective intent to run would suffice to make an individual a candidate, *see* FEC Advisory Opinion 2015-09 at 5 (Senate Maj. PAC, et al.), it also explains that the Commission will look ultimately at "objective indication[s]" of candidates' intent to run—even when the candidate asserts a subjective intent not to do so, *id.* at 6. The advisory opinion therefore does not support the Statement's claim that it would have been necessary to probe Scott's subjective intent. JA290.

Even if the controlling Commissioners had been correct about the nature of the FEC's candidacy test, because those Commissioners "reference[d] their merits analysis as a ground for exercising prosecutorial discretion," *New Models II*, 55 F.4th at 920 (Rao, J., concurring in denial of reh'g en banc) (cleaned up), that

analysis is subject to judicial review under FECA's contrary to law standard. In contrast to an invocation of prosecutorial discretion premised entirely on prudential and discretionary considerations—like that in *New Models*—here, there was a meaningful standard against which to judge the Commissioners' exercise of discretion: FECA provisions and FEC regulations defining the FEC's objective analysis for when an individual has become a candidate.

The district court even acknowledged that the controlling Commissioners referenced their merits analysis as a ground for exercising their prosecutorial discretion, specifically identifying "the inherent difficulty of assessing Scott's subjective intent" as "one of multiple factors the controlling Commissioners cited in exercising their prosecutorial discretion." JA109. That finding alone compels the conclusion that the controlling Commissioners' invocation of prosecutorial discretion depended on their assessment of the merits and, thus, is not insulated from judicial review. The district court, however, continued to maintain that the dismissal was unreviewable for two incorrect reasons.

First, the district court stated that the controlling Commissioners' interpretation of FECA was "only one of multiple factors the controlling Commissioners cited in exercising their prosecutorial discretion, alongside limited agency resources and a 'substantial backlog of cases.'" JA109. Even so, the decision

31

is reviewable because it nevertheless "rests *solely* on legal interpretation." *New Models*, 993 F.3d at 884. As the Statement makes clear, the cited resource and backlog concerns are *dependent* on the controlling Commissioners' (incorrect) interpretation of FECA: the Statement's alleged concern about "authorizing an expensive and resource consuming investigation while the Commission is still working through a backlog of cases" is directly premised on the controlling Commissioners' view that FECA's candidacy determination would require "prob[ing Scott's] subjective intent" (which the Statement claims would, in turn, require a "wide-ranging, costly, and invasive investigation"). JA290. Tellingly, the Statement does not claim that the controlling Commissioners would have exercised prosecutorial discretion even if their view of the FEC's candidacy test were incorrect. JA290. Because the invocation of discretion was thus dependent on the controlling Commissioners' view of FECA, the dismissal was reviewable.

Second, the district court also erred when it concluded that the legal analysis undergirding the invocation of prosecutorial discretion must be "erroneous" for the dismissal to be reviewable. *See* JA109 (faulting End Citizens United for "identif[ying] *no* legal error underlying" the assertion of prosecutorial discretion) (emphasis in original). Putting aside the fact that the controlling Commissioners' legal analysis in this case *was* erroneous, *see supra* p. 28, the district court's

32

reasoning puts the merits cart before the reviewability horse. An FEC dismissal is reviewable whenever that decision was made "on the basis of its interpretation of FECA," *Comm'n on Hope*, 892 F.3d at 441 n.11, whether that interpretation is later determined to be correct or not. Accordingly, once the district court concluded that the controlling Commissioners "reference[d] their merits analysis as a ground for exercising prosecutorial discretion," *New Models II*, 55 F.4th at 920 (Rao, J., concurring in denial of reh'g en banc); *see also* JA109, it should have concluded that the legal reasoning underpinning the dismissal of MUR 7370 was reviewable and then conducted a full "contrary-to-law" review.

Because the controlling Commissioners based their exercise of prosecutorial discretion solely on their view of the merits of the case, the dismissal of MUR 7370 is reviewable, and the district court erred in concluding otherwise.

> **2.    The District Court's Decision Rests on Precedent That Should Not Be Followed Because It Is Inconsistent with Fixed Law**

For the reasons explained above, *Commission on Hope* and *New Models* are readily distinguishable from this case. But in the event the Court disagrees, End Citizens United notes that both those divided panel decisions rest on a premise contradicted by FECA and governing precedent: that FEC dismissal decisions are "control[led]" by *Heckler* and its "presumption" that "an agency's decision not to

undertake enforcement" is unreviewable. *Comm'n on Hope*, 892 F.3d at 439. As the Supreme Court has confirmed, FECA "explicitly indicates the contrary." *Akins*, 524 U.S. at 26; *see also Akins v. FEC*, 101 F.3d 731, 734 (D.C. Cir. 1996) (en banc) (noting that FECA "permits a complainant to bring to federal court an agency's refusal to institute enforcement proceedings"), *vacated on other grounds by* 524 U.S. 11 (1998); *Chamber of Com. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995) (holding that a dismissal based on the FEC's "unwillingness" to proceed is subject to judicial review); *Democratic Congressional Campaign Comm. v. FEC*, 831 F.2d 1131, 1134-35 & n.5 (D.C. Cir. 1987) (declining to "confin[e] the judicial check [in § 30109(a)(8)(C)] to cases in which . . . Commission acts on the merits"); *Orloski*, 795 F.2d 156 (recognizing dismissals could be contrary to law *either* because they contained legal error or because they were otherwise arbitrary, capricious, or an abuse of discretion). Indeed, because "[t]he law of the circuit . . . was well established long before the decision in [*Commission on Hope*]," *Democracy 21*, 952 F.3d at 362 (Edwards, J., concurring) (citations omitted), it is that prior law that must be given effect, *see Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) ("[W]hen a decision of one panel is inconsistent with the decision of a prior panel, the norm is that the later decision, being in violation of that fixed law, cannot prevail.").

\*    \*    \*

For the foregoing reasons, the district court erred in concluding that it lacked subject-matter jurisdiction to review the FEC's dismissal of MUR 7370.

## II. The District Court Erred in Finding the FEC's Dismissal of MUR 7496 Not Contrary to Law

The district court also erred in finding that the FEC did not act contrary to law by dismissing MUR 7496, regarding the coordination claims. First, the dismissal was contrary to law both because the controlling Commissioners failed to adequately explain their decision to dismiss these allegations, and because End Citizens United credibly alleged that the Scott Campaign and New Republican coordinated. Second, the district court erred in concluding that the dismissal was reasonable because the court overlooked the Statement's clear legal errors and misinterpreted the administrative record.

### A.    The FEC's Dismissal of MUR 7496 Was Contrary to Law

The FEC acted contrary to law when it dismissed MUR 7496 by failing both to adequately explain its decision and to find reason to believe a violation occurred.

To satisfy the reason-to-believe standard, "the available evidence in the matter" need only be "at least sufficient to warrant conducting an investigation" into the serious violations alleged. FEC Statement of Policy, 72 Fed. Reg. at 12,545. This standard presents a "low bar," which requires "only a credible allegation" of

35

wrongdoing, and "does not require 'conclusive evidence' that a violation occurred or even 'evidence supporting probable cause' for finding a violation." *Campaign Legal Ctr.*, 2022 WL 17496220 at *8. This low bar was easily satisfied here.

Under FECA, super PACs may not contribute to candidates or their authorized committees by making coordinated communications. *See supra* pp. 7-8. Candidates, likewise, are prohibited from accepting such contributions from super PACs. *Id.* FEC rules create a three-part test to assess whether a communication is coordinated and, therefore, an in-kind contribution. *See* 11 C.F.R. § 109.21(a).

The record establishes, at a minimum, that there is reason to believe that the May and June 2018 advertisements qualified as coordinated communications. As the administrative respondents did not dispute, the May and June 2018 advertisements satisfy the first two elements of the coordinated-communication test. *See* JA231. First, because New Republican paid for the commercials, the communications were "paid for . . . by a person other than [the] candidate" or his authorized committee. 11 C.F.R. § 109.21(a)(1). Second, because the commercials aired on public television and expressly advocated the defeat of Scott's opponent, Bill Nelson, they satisfied the second prong of the coordinated-communication test. *See id.* § 109.21(a)(2), (c)(3).

The administrative record also establishes reason to believe that the advertisements satisfy the third prong of the coordinated-communications test, which requires that the communication meet one or more of the FEC's so-called "conduct standards." *Id.* § 109.21(a)(3). A conduct standard is satisfied where a communication is either "created, produced, or distributed at the request or suggestion of a candidate," *id.* § 109.21(d)(1), or "created, produced, or distributed after one or more substantial discussions about the communication between" the payor or its agents and the candidate whom the message benefits, during which discussions "[material] information about the candidate's . . . campaign plans, projects, activities, or needs is conveyed to [the entity] paying for the communication," *id.* § 109.21(d)(3).

There is reason to believe that at least one of these two conduct standards is satisfied here because End Citizens United credibly alleged that Scott either requested that his allies at New Republican produce the advertisements to benefit his campaign, or at least had material discussions with those allies that affected the super PAC's decisionmaking with respect to the communications. The record demonstrates that in May 2017, Scott took control of New Republican, JA33, 35, 153, 165, 170, 226; staffed it with political allies, JA33, 35, 226; used it to raise funds in service of his imminent Senate campaign, JA118, 125, 214; ran it until at

37

least December 2017, and likely longer, JA136, 153, 176, 214-17, 227; remained involved in the super PAC's fundraising until at least March 2018, JA45, 153, 216; and participated in a conference call with donors in August 2018, JA204, 217. Indeed, the FEC's General Counsel concluded that the record indicates that Scott was involved with New Republican "well into 2018," and during that time, the super PAC "served as a vehicle to amass funds that would benefit Scott's candidacy for U.S. Senate." JA210. The ads at issue aired only shortly after Scott's departure from the super PAC and mere weeks after his participation in the March 2018 fundraiser, and all while key Scott allies continued to hold high-ranking positions within New Republican. *See* JA167 (noting that Scott's former chief of staff and campaign manager was a senior adviser to New Republican when the advertisements aired).

Despite this record evidence and the reason-to-believe standard's "low bar," the controlling Commissioners dismissed the coordination claims in a decision that is contrary to law for two reasons. First, the Statement provides almost no explanation for the dismissal. *See* JA281-82 nn.1 & 2, 285-91. This lack of reasoning renders the dismissal contrary to law. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that agency action is arbitrary and capricious where the agency fails to "articulate a satisfactory explanation for its action"); *see also Robertson v. FEC*, 45 F.3d 486, 493 (D.C. Cir.

38

1995) (holding that a statement of reasons that was too "terse" in rejecting an argument "without elaboration" failed "to meet the standard of reasoned agency decisionmaking").

At no point in their 11-page single-spaced, 53-footnote Statement of Reasons did the controlling Commissioners assess the merits of the coordination claims. Indeed, the Statement's only fleeting reference to the coordination allegation appears in a footnote summarizing the General Counsel's Report. *See* JA281 n.1 ("[The General Counsel] also recommended taking no action at this time regarding various other allegations, such as whether Scott himself violated the soft money rules, and whether communications disseminated by New Republican PAC constituted illegal coordination with Scott's allegedly untimely-filed campaign.") (citations omitted). Absent any substantive discussion of the coordinated-communications issue, the Statement of Reasons cannot meet the controlling Commissioners' burden to supply a "satisfactory explanation" for their decision. *State Farm*, 463 U.S. at 43.

Second, the dismissal of the coordination claims was contrary to law for the independent reason that, to the extent the controlling Commissioners provided any rationale for the dismissal, they relied on "an impermissible interpretation" of FECA. *Orloski*, 795 F.2d at 161; *see also* ECF No. 23 at 35-36. In the Statement's second footnote, the controlling Commissioners' offered a catchall rationale for

39

dismissing "the remainder of the allegations against" the administrative respondents, including the coordination claims. *See* JA282 n.2 ("Footnote 2"). Footnote 2 then states that "[a]ll of those allegations would have required . . . a threshold finding that Scott had failed to file a statement of candidacy at the appropriate time, or that New Republican had violated the soft money rules." *Id.*

But as End Citizens United explained to the district court, *see* ECF No. 23 at 35-36, that statement is a clear legal error: the merits of the coordination claims in MUR 7496 do not depend on the success of the claims in MUR 7370, which allege that Scott became a candidate in 2017 and subsequently violated the soft-money ban by fundraising for New Republican. The Commission could have determined that MUR 7370 failed on its merits because Scott did not become a candidate at some point in 2017, while also concluding that, after Scott's April 2018 announcement of candidacy, he had unlawfully coordinated with New Republican on the airing of its May and June 2018 advertisements supporting the Scott Campaign. Whether Scott and New Republican coordinated those ads turns on whether "New Republican used strategic campaign information obtained from Scott in the development of the advertisement[s] and that the advertisement were created, produced, or distributed at the request or suggestion of" Scott while he was a candidate. JA231-32 (internal quotation marks omitted). As End Citizens United's administrative complaint

40

alleges, Scott reportedly "remained in contact with [New Republican] as recently as late August 2018," long after the April 9, 2018 date on which Scott admits becoming a candidate, and spanning the period during which the May and June 2018 ads were aired. JA68-69. Thus, the controlling Commissioners' assertion that the coordination violation would require "a threshold finding" that Scott had become a candidate in 2017 was contrary to law. *See Orloski*, 795 F.2d at 161.

###    B.    The District Court Misinterpreted the Record Evidence and Disregarded the Controlling Commissioners' Clear Legal Errors

Despite the controlling Commissioners' clear legal errors, the lower court found that the FEC's dismissal of the coordination claims was not contrary to law. This holding constitutes reversible error for two reasons: first, the court failed to correct the controlling Commissioners' faulty legal analysis; and second, the district court's decision depends on a misinterpretation of the record evidence.

###        1.    The District Court Disregarded the Controlling Commissioners' Clear Legal Errors

The district court erred by finding that the Statement provided sufficient reasoning, and by crediting the Statement's incorrect conclusion that the merits of the coordination claims depended on the merits of the candidacy-filing and soft-money allegations.

41

There is no dispute in this case that the merits of the coordination claims do not depend on the merits of the candidacy-filing or soft-money claims. Before the district court, New Republican did not dispute that these claims are distinct, *see* ECF No. 32 at 16, admitting that they present "different legal questions," *id.* The district court likewise did *not* conclude that, under FECA, the coordination claims could succeed only if the candidacy-filing and soft-money claims have merit. *See* JA110-13. Instead, the district court upheld the Statement's dismissal by misinterpreting Footnote 2 as "*not* refer[ring] to the coordinated communication allegations," but only the allegations relating to "raising and spending soft money, failing to timely report, and failing to timely file a statement of organization." JA112 (citing JA282 n.2) (emphasis in original).

For three reasons, the district court is incorrect; Footnote 2's reference to "the remainder of the allegations" does, in fact, include the coordination claims. First, the language of Footnote 2 and the sentence to which it is appended make clear that the note is discussing the coordination claims. The sentence to which Footnote 2 is appended refers to four claims: (1) the soft-money ban claim against New Republican; (2) the candidacy-filing claim; and (3 and 4) the claims that Scott's campaign committee failed to file its "organization paperwork," JA282, which includes its Statement of Organization and finance disclosure reports, *see supra* p.

42

15. Those four claims aside, the only remaining claims in MURs 7370 and 7496 are the allegations that Scott violated the soft-money ban and that Scott, the Scott Campaign, and New Republican violated the coordination rules. *See supra* p. 15 Thus, when Footnote 2 refers to "the remainder of the allegations *against Scott, his authorized committee, and New Republican PAC*," JA282 n.2 (emphasis added), it is necessarily referring to the coordination claims, as they are the only claims remaining against all three respondents. In contrast, the district court's reading of Footnote 2 makes little sense because it suggests that the text and the footnote are referring to the same claims, despite the note's reference to "the remainder of the allegations." *Id.*

Second, although Footnote 2's clear text resolves the issue, any ambiguity is put to rest by the fact that the note's reference to "the remainder of the allegations" cites the FEC's vote certification for MURs 7370 *and* 7496, *see id.*, which includes the agency's votes on the coordination claims, *see* JA272-73 (¶¶ 1.e-g).

Third, a separate footnote in the Statement—footnote 25—also confirms that Footnote 2 is discussing the coordination claims. The sentence to which footnote 25 is appended discusses how the "principal allegations against the Respondents" center on FECA's soft-money ban and candidacy-filing requirements. JA285. Footnote 25 then contrasts those "principal" allegations with "the remaining allegations in the

43

*complaints*, *as discussed* supra *at n.2*." *Id.* at n.25 (emphasis added). The reference to "complaints," in the plural, proves beyond all doubt that the coordination claims of the MUR 7496 complaint are incorporated into Footnote 2's discussion.

The Statement thus makes clear that the controlling Commissioners dismissed the coordination claims on the incorrect ground that they required a "threshold finding" with respect to the candidacy and soft-money allegations, "despite the lack of a logical nexus between those claims." JA112. Accordingly, the district court should have held that the dismissal of the coordination claims was contrary to law, and its failure to do so is a mistake that should be reversed.

## 2. The District Court Misinterpreted the Record Evidence

Instead of declaring the controlling Commissioners' incorrect legal analysis contrary to law, the district court dismissed, in large part, due to the General Counsel's recommendation to take no action on the coordination claims, deeming this fact "critical." JA110; *see also generally* JA110-13. Even if, as the district court concluded, the controlling Commissioners adopted the General Counsel's reasoning in dismissing the coordination claims, *see* JA111, the district court nevertheless erred in upholding the dismissal on that basis for two reasons.

First, even if the controlling Commissioners adopted the General Counsel's reasoning, that adoption could not remedy the fact that the controlling

44

Commissioners also based their dismissal at least in part on grounds that are contrary to FECA, in Footnote 2. *See supra* at 40-42. At no point does the Statement claim that the erroneous rationale stated in Footnote 2 was not essential to its dismissal of the coordination allegations. Indeed, in the very footnote the district court claims adopted the General Counsel's reasoning, footnote 25, the controlling Commissioners expressly cite and incorporate their "discuss[ion] *supra* at n.2." JA285 n.25.

Second, and in any event, the district court's conclusion that the General Counsel's analysis supported the agency's dismissal is wrong because it is based on a basic misunderstanding of FEC procedure. The district court incorrectly equated the General Counsel's recommendation to "[t]ake no action at this time," JA233, with the General Counsel having "investigated" the allegation and "found no reason to believe that any violation had occurred," JA110. But under FECA, as well as Commission policy and procedures, these are distinct legal terms of art with distinct meanings. An "investigation" may occur only after the Commission has first found "reason to believe," *see* 52 U.S.C. § 30109(a)(2); 72 Fed. Reg. at 12,545, and so no investigation occurred here. Further, the General Counsel did not recommend finding "no reason to believe," because that finding results in dismissal of a matter, *see* 11 C.F.R. § 111.20(a), and is appropriate only where the available record "fail[s]

45

to give rise to a reasonable inference that a violation has occurred, or even if the allegations were true, would not constitute a violation of the law." 72 Fed. Reg. at 12,546.

In contrast, where the General Counsel, as here, recommends that the FEC "[t]ake no action at this time," it is expressly not recommending dismissal or weighing in on whether "reason to believe" exists. As the agency's enforcement manual explains, the General Counsel will recommend taking no action "in cases involving multiple allegations and respondents, and when there are grounds to recommend [reason to believe] as to at least one respondent and to investigate at least some of the allegations," since in the course of that investigation, "the General Counsel may develop a broader factual basis for determining what recommendation to make at a later time regarding the other allegation or respondent." FEC, Office of the General Counsel, OGC Enforcement Manual 50 (2013) (emphasis added), https://www.fec.gov/resources/updates/agendas/2013/mtgdoc_13-21.pdf.

The General Counsel's recommendation to take no action on the coordination claims, therefore, did not support dismissal or finding "no reason to believe that any violation had occurred," as the district court concluded.[3] Rather, the General

---

[3]    Nor did the General Counsel's "take no action" recommendation support the district court's assertion that the General Counsel categorically "found that [End

Counsel acknowledged that further investigation could uncover information supporting reason to believe there was a coordination violation, and, consequently, recommended deferring action. Indeed, while the General Counsel noted that no information "available," including in the administrative complaint, "suggest[ed] that Scott was specifically involved in or requested the production and distribution of the May 3 or June 11 advertisements," JA232, it also acknowledged that what information was available "supports a reasonable inference that Scott continued to be involved with New Republican after December 2017." JA226; *see also id.* at JA235 ("[I]t appears that Scott did not step down from New Republican in December 2017, as respondents contend, but continued his involvement with New Republican well into 2018").

Accordingly, the General Counsel did not recommend dismissal, but rather that "the Commission take no action *at this time* as to the allegations of" coordinated communications, "[g]iven that information discovered during our proposed investigation into Scott's involvement with New Republican in 2017 and 2018 may impact our analysis of this allegation." JA232 (emphasis added); *see also* JA230 ("The Commission should take no action *at this time* regarding the allegation that

---

Citizens United]'s allegation failed to meet the conduct standard under 11 C.F.R. § 109.21(a)." JA111 (citing JA230-31).

the Committee and New Republican coordinated communications.") (emphasis added); JA233-34 (same, *see* recommendations 5-7). Even the controlling Commissioners recognized this distinction. *See* Statement of Reasons, JA281 n.1 ("OGC also recommended taking no action *at this time*.") (emphasis added) (citation omitted); *see also* JA285 n.25 ("OGC did not believe there was sufficient evidence to support a reason to believe finding *at this juncture*.") (emphasis added). The district court thus fundamentally mischaracterized the very piece of evidence it deemed "critical" to its analysis.

Not only did the district court mischaracterize the General Counsel's recommendation, it also mischaracterized the General Counsel's analysis. The district court claimed that "the [General Counsel] credited an affidavit by [New Republican]'s executive director, Blaise Hazelwood, flatly denying any communication or coordination with the Scott campaign." JA111 (citing JA232); *see also* JA112 ("I have little difficulty in determining the Commission acted reasonably in relying on the Hazelwood affidavit and adopting [General Counsel's] interpretation as to the weight of that evidence."). But the General Counsel did not credit Ms. Hazelwood's affidavit with respect to these allegations, it simply mentioned it in summarizing the administrative respondents' position. *See* JA232. Far from crediting the affidavit, the General Counsel cast doubt on the affidavit in

48

the next paragraph, stressing that what information was available supported "a reasonable inference that Scott continued to be involved with New Republican after December 2017." *Id.* Not only that, but the General Counsel affirmatively discredited Ms. Hazelwood's claim that New Republican did not work with Scott on the redesign and launch of its Scott-focused website on the day Scott announced his candidacy. JA223-24. Indeed, the controlling Commissioners themselves acknowledged that the General Counsel discredited the Hazelwood affidavit. *See* JA289 (admitting that the General Counsel "dismiss[ed] the sworn statement of Ms. Hazelwood" in finding that New Republican's poll testing of Scott's competitiveness amounted to spending funds to further his candidacy).

Besides mischaracterizing the General Counsel's treatment of Ms. Hazelwood's affidavit, the district court went still further, mischaracterizing the controlling Commissioners' assessment of that affidavit. The court claimed that "[i]t was reasonable of the FEC to rely on [Ms. Hazelwood's] affidavit to assess" the coordination claims. JA111-12. But, as End Citizens United pointed out to the district court, *see* ECF No. 30 at 23, the Statement of Reasons at no point connected the affidavit to these allegations; indeed, it discussed Ms. Hazelwood's affidavit only twice, in summarizing the relevant facts, *see* JA284-85, and in assessing the candidacy-filing claim, *see* JA289. Accordingly, it is not correct that the controlling

49

Commissioners either relied on Ms. Hazelwood's affidavit or "adopt[ed] OGC's interpretation as to the weight of that evidence," to dismiss the coordination claims. *See* JA112.

Moreover, as End Citizens United pointed out to the district court, *see* ECF No. 30 at 21-22, even if the General Counsel or the controlling Commissioners had credited Ms. Hazelwood's affidavit with respect to the coordination claims—which they did not—the affidavit deserved little weight during judicial review. *See, e.g.*, *LaBotz v. FEC*, 889 F. Supp. 2d 51, 61-62 (D.D.C. 2012) (concluding that an affidavit could not justify an FEC dismissal where it was "written in summary fashion," was provided after the FEC's inquiry had commenced, was contradicted by some contemporaneous evidence, and was unclear as to the affiant's personal knowledge of some elements of the affidavit).

Finally, the district court analysis fell short in two additional ways. First, the district court claimed that "[t]he FEC . . . explained its decision by noting that the reporting on which [End Citizens United] relied to draw the inference of coordinated communications 'came from an outside organization and were not premised on whistleblower testimony or any other sworn statement from someone with direct, personal knowledge,'" JA111 (quoting JA289 n.45). But footnote 45 is not about the coordination claims, but rather the candidacy-filing claim and the credibility of

50

public reporting regarding New Republican's poll testing for Scott. *See* JA289 & n.45. Accordingly, it does not "further explain[]" the FEC decision with respect to the coordination claims. *See* JA111.

Second, the district court found that End Citizens United "has identified no reason why the FEC should have discounted Ms. Hazelwood's sworn testimony in favor of those third-party allegations" in the administrative complaints. *Id.* But End Citizens United did, in fact, identify reasons why the FEC should have discounted the Hazelwood affidavit. It (and the General Counsel) identified two distinct flaws with the affidavit, only one of which the district court addressed. End Citizens United pointed out that the affidavit "discussed only the time period after Hazelwood joined New Republican in February 2018," and "did not address whether other individuals associated with New Republican and involved in its decisionmaking may have coordinated with Scott or the Scott Campaign, or whether the super PAC's actions were influenced by materials developed by Scott during his tenure." ECF No. 30 at 22-23. And yet the district court summarily concluded that Hazelwood "assumed her role at [New Republican] in February 2018 and so was unable to speak to violations alleged to have occurred before that time." JA111. *But see* ECF No. 23 at 26, 28-29; JA224.

The district court thus committed multiple errors when evaluating the record, including the General Counsel's recommendation with respect to the coordination claims, the evidence underlying it, and the weight given to that evidence. The district court has identified an authoritative finding where there was none, based on evidence that neither the General Counsel nor the controlling Commissioners credited. This contortion of the record amounts to reversible error.

In sum, the Court should reverse the district court's conclusion that the FEC's dismissal of the coordination claims was not contrary to law.

## CONCLUSION

For the foregoing reasons, End Citizens United respectfully requests that this Court reverse the district court's dismissal of this case.

Dated: January 25, 2023

Respectfully submitted,

/s/ *Kevin P. Hancock*

Adav Noti
Kevin P. Hancock
Alexandra Copper*
Allison Walter
CAMPAIGN LEGAL CENTER ACTION
1101 14th Street, NW, St. 400
Washington, D.C. 20005
(202) 736-2000
khancock@campaignlegalcenter.org

52

*Counsel for Appellant*

*\* Not a member of the D.C. Bar; practicing before the federal courts pursuant to D.C. App. Rule 49(c)(3)*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 11,181 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Office Word 2016 in Times New Roman 14-point font.

## CERTIFICATE OF SERVICE

I certify that on January 25, 2023, I electronically filed this brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system, thereby serving all persons required to be served.

*/s/ Kevin P. Hancock*
Kevin P. Hancock

**ADDENDUM**

## TABLE OF CONTENTS

28 U.S.C. § 1291 ...................................................................................... 1a

28 U.S.C. § 1331 ...................................................................................... 1a

52 U.S.C. § 30101(2), (4), (8)(A) ............................................................ 1a

52 U.S.C. § 30102(e)(1) ........................................................................... 2a

52 U.S.C. § 30103(a) ................................................................................ 3a

52 U.S.C. § 30104(a) ................................................................................ 4a

52 U.S.C. § 30106(c) .............................................................................. 10a

52 U.S.C. § 30107(a) .............................................................................. 11a

52 U.S.C. § 30109(a) .............................................................................. 12a

52 U.S.C. § 30116(a)(1), (a)(2), (f) ....................................................... 17a

52 U.S.C. § 30118(a) .............................................................................. 18a

52 U.S.C. § 30125(e) .............................................................................. 19a

11 C.F.R. § 100.72(b) ............................................................................. 20a

11 C.F.R. § 100.131(b) ........................................................................... 21a

11 C.F.R. § 101.1(a) ............................................................................... 22a

11 C.F.R. § 109.21(a), (c), (d) ............................................................... 22a

11 C.F.R. § 300.2(c) ............................................................................... 28a

## 28 U.S.C. § 1291
## Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 U.S.C. § 1331
## Federal Question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 52 U.S.C. § 30101(2), (4), (8)(A)
## Definitions

**(2)** The term "candidate" means an individual who seeks nomination for election, or election, to Federal office, and for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election—

\*      \*      \*

**(4)** The term "political committee" means—

**(A)** any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year; or

**(B)** any separate segregated fund established under the provisions of section 30118(b) of this title; or

**(C)** any local committee of a political party which receives contributions aggregating in excess of $5,000 during a calendar year, or makes payments exempted from the definition of contribution or expenditure as defined in

1a

paragraphs (8) and (9) aggregating in excess of $5,000 during a calendar year, or makes contributions aggregating in excess of $1,000 during a calendar year or makes expenditures aggregating in excess of $1,000 during a calendar year.

\*       \*       \*

**(8)(A)** The term "contribution" includes—

**(i)** any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or

**(ii)** the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

## 52 U.S.C. § 30102(e)
## Organization of Political Committees

**(e) Principal and additional campaign committees; designations, status of candidate, authorized committees, etc.**

**(1**) Each candidate for Federal office (other than the nominee for the office of Vice President) shall designate in writing a political committee in accordance with paragraph (3) to serve as the principal campaign committee of such candidate. Such designation shall be made no later than 15 days after becoming a candidate. A candidate may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate. Such designation shall be in writing and filed with the principal campaign committee of such candidate in accordance with subsection (f)(1).

**(2)** Any candidate described in paragraph (1) who receives a contribution, or any loan for use in connection with the campaign of such candidate for election, or makes a disbursement in connection with such campaign, shall be considered, for purposes of this Act, as having received the contribution or loan, or as having made the disbursement, as the case may be, as an agent of the authorized committee or committees of such candidate.

**(3)(A)** No political committee which supports or has supported more than one candidate may be designated as an authorized committee, except that—

> (i) the candidate for the office of President nominated by a political party may designate the national committee of such political party as a principal campaign committee, but only if that national committee maintains separate books of account with respect to its function as a principal campaign committee; and

> (ii) candidates may designate a political committee established solely for the purpose of joint fundraising by such candidates as an authorized committee.

**(B)** As used in this section, the term "support" does not include a contribution by any authorized committee in amounts of $2,000 or less to an authorized committee of any other candidate.

**(4)** The name of each authorized committee shall include the name of the candidate who authorized such committee under paragraph (1). In the case of any political committee which is not an authorized committee, such political committee shall not include the name of any candidate in its name.

**(5)** The name of any separate segregated fund established pursuant to section 30118(b) of this title shall include the name of its connected organization.


**52 U.S.C. § 30103(a)**
**Registration of Political Committees**

**(a) Statements of organizations**

Each authorized campaign committee shall file a statement of organization no later than 10 days after designation pursuant to section 30102(e)(1) of this title. Each separate segregated fund established under the provisions of section 30118(b) of this title shall file a statement of organization no later than 10 days after establishment. All other committees shall file a statement of organization within 10 days after becoming a political committee within the meaning of section 30101(4) of this title.

## 52 U.S.C. § 30104(a)
## Reporting requirements

**(a) Receipts and disbursements by treasurers of political committees; filing requirements**

**(1)** Each treasurer of a political committee shall file reports of receipts and disbursements in accordance with the provisions of this subsection. The treasurer shall sign each such report.

**(2)** If the political committee is the principal campaign committee of a candidate for the House of Representatives or for the Senate--

**(A)** in any calendar year during which there is1 regularly scheduled election for which such candidate is seeking election, or nomination for election, the treasurer shall file the following reports:

> (i) a pre-election report, which shall be filed no later than the 12th day before (or posted by any of the following: registered mail, certified mail, priority mail having a delivery confirmation, or express mail having a delivery confirmation, or delivered to an overnight delivery service with an on-line tracking system, if posted or delivered no later than the 15th day before) any election in which such candidate is seeking election, or nomination for election, and which shall be complete as of the 20th day before such election;

> (ii) a post-general election report, which shall be filed no later than the 30th day after any general election in which such candidate has sought election, and which shall be complete as of the 20th day after such general election; and

> (iii) additional quarterly reports, which shall be filed no later than the 15th day after the last day of each calendar quarter, and which shall be complete as of the last day of each calendar quarter: except that the report for the quarter ending December 31 shall be filed no later than January 31 of the following calendar year; and

**(B)** in any other calendar year the treasurer shall file quarterly reports, which shall be filed not later than the 15th day after the last day of each calendar quarter, and which shall be complete as of the last day of each calendar quarter, except that the report for the quarter ending December 31 shall be filed not later than January 31 of the following calendar year.

**(3)** If the committee is the principal campaign committee of a candidate for the office of President--

4a

**(A)** in any calendar year during which a general election is held to fill such office--

(i) the treasurer shall file monthly reports if such committee has on January 1 of such year, received contributions aggregating $100,000 or made expenditures aggregating $100,000 or anticipates receiving contributions aggregating $100,000 or more or making expenditures aggregating $100,000 or more during such year: such monthly reports shall be filed no later than the 20th day after the last day of each month and shall be complete as of the last day of the month, except that, in lieu of filing the report otherwise due in November and December, a pre-general election report shall be filed in accordance with paragraph (2)(A)(i), a post-general election report shall be filed in accordance with paragraph (2)(A)(ii), and a year end report shall be filed no later than January 31 of the following calendar year;

(ii) the treasurer of the other principal campaign committees of a candidate for the office of President shall file a pre-election report or reports in accordance with paragraph (2)(A)(i), a post-general election report in accordance with paragraph (2)(A)(ii), and quarterly reports in accordance with paragraph (2)(A)(iii); and

(iii) if at any time during the election year a committee filing under paragraph (3)(A)(ii) receives contributions in excess of $100,000 or makes expenditures in excess of $100,000, the treasurer shall begin filing monthly reports under paragraph (3)(A)(i) at the next reporting period; and

**(B)** in any other calendar year, the treasurer shall file either--

(i) monthly reports, which shall be filed no later than the 20th day after the last day of each month and shall be complete as of the last day of the month; or

(ii) quarterly reports, which shall be filed no later than the 15th day after the last day of each calendar quarter and which shall be complete as of the last day of each calendar quarter.

**(4)** All political committees other than authorized committees of a candidate shall file either--

**(A)**

(i) quarterly reports, in a calendar year in which a regularly scheduled general election is held, which shall be filed no later than the 15th day after the last day of each calendar quarter: except that the report for the quarter ending on December 31 of such calendar year shall be filed no later than January 31 of the following calendar year;

(ii) a pre-election report, which shall be filed no later than the 12th day before (or posted by any of the following: registered mail, certified mail, priority mail having a delivery confirmation, or express mail having a delivery confirmation, or delivered to an overnight delivery service with an on-line tracking system, if posted or delivered no later than the 15th day before) any election in which the committee makes a contribution to or expenditure on behalf of a candidate in such election, and which shall be complete as of the 20th day before the election;

(iii) a post-general election report, which shall be filed no later than the 30th day after the general election and which shall be complete as of the 20th day after such general election; and

(iv) in any other calendar year, a report covering the period beginning January 1 and ending June 30, which shall be filed no later than July 31 and a report covering the period beginning July 1 and ending December 31, which shall be filed no later than January 31 of the following calendar year; or

**(B)** monthly reports in all calendar years which shall be filed no later than the 20th day after the last day of the month and shall be complete as of the last day of the month, except that, in lieu of filing the reports otherwise due in November and December of any year in which a regularly scheduled general election is held, a pre-general election report shall be filed in accordance with paragraph (2)(A)(i), a post-general election report shall be filed in accordance with paragraph (2)(A)(ii), and a year end report shall be filed no later than January 31 of the following calendar year.

Notwithstanding the preceding sentence, a national committee of a political party shall file the reports required under subparagraph (B).

**(5)** If a designation, report, or statement filed pursuant to this Act (other than under paragraph (2)(A)(i) or (4)(A)(ii) or subsection (g)(1)) is sent by registered mail, certified mail, priority mail having a delivery confirmation, or express mail having a delivery confirmation, the United States postmark shall be considered the date of filing the designation, report or statement. If a designation, report or statement filed pursuant to this Act (other than under paragraph (2)(A)(i) or (4)(A)(ii), or subsection (g)(1)) is sent by an overnight delivery service with an on-line tracking system, the date on the proof of delivery to the delivery service shall be considered the date of filing of the designation, report, or statement.

**(6)(A)** The principal campaign committee of a candidate shall notify the Secretary or the Commission, and the Secretary of State, as appropriate, in writing, of any contribution of $1,000 or more received by any authorized committee of such candidate after the 20th day, but more than 48 hours before, any election. This notification shall be made within 48 hours after the receipt of such contribution and

shall include the name of the candidate and the office sought by the candidate, the identification of the contributor, and the date of receipt and amount of the contribution.

**(B)** Notification of expenditure from personal funds

(i) Definition of expenditure from personal funds

In this subparagraph, the term "expenditure from personal funds" means--

(I) an expenditure made by a candidate using personal funds; and

(II) a contribution or loan made by a candidate using personal funds or a loan secured using such funds to the candidate's authorized committee.

(ii) Declaration of intent

Not later than the date that is 15 days after the date on which an individual becomes a candidate for the office of Senator, the candidate shall file a declaration stating the total amount of expenditures from personal funds that the candidate intends to make, or to obligate to make, with respect to the election that will exceed the State-by-State competitive and fair campaign formula with--

(I) the Commission; and

(II) each candidate in the same election.

(iii) Initial notification

Not later than 24 hours after a candidate described in clause (ii) makes or obligates to make an aggregate amount of expenditures from personal funds in excess of 2 times the threshold amount in connection with any election, the candidate shall file a notification with--

(I) the Commission; and

(II) each candidate in the same election.

(iv) Additional notification

After a candidate files an initial notification under clause (iii), the candidate shall file an additional notification each time expenditures from personal funds are made or obligated to be made in an aggregate amount that exceed2 $10,000 with--

(I) the Commission; and

(II) each candidate in the same election.

7a

Such notification shall be filed not later than 24 hours after the expenditure is made.

(v) Contents

A notification under clause (iii) or (iv) shall include--

> (I) the name of the candidate and the office sought by the candidate;
>
> (II) the date and amount of each expenditure; and
>
> (III) the total amount of expenditures from personal funds that the candidate has made, or obligated to make, with respect to an election as of the date of the expenditure that is the subject of the notification.

**(C)** Notification of disposal of excess contributions

In the next regularly scheduled report after the date of the election for which a candidate seeks nomination for election to, or election to, Federal office, the candidate or the candidate's authorized committee shall submit to the Commission a report indicating the source and amount of any excess contributions (as determined under paragraph (1) of section 30116(i) of this title) and the manner in which the candidate or the candidate's authorized committee used such funds.

**(D)** Enforcement

For provisions providing for the enforcement of the reporting requirements under this paragraph, see section 30109 of this title.

**(E)** The notification required under this paragraph shall be in addition to all other reporting requirements under this Act.

**(7)** The reports required to be filed by this subsection shall be cumulative during the calendar year to which they relate, but where there has been no change in an item reported in a previous report during such year, only the amount need be carried forward.

**(8)** The requirement for a political committee to file a quarterly report under paragraph (2)(A)(iii) or paragraph (4)(A)(i) shall be waived if such committee is required to file a pre-election report under paragraph (2)(A)(i), or paragraph (4)(A)(ii) during the period beginning on the 5th day after the close of the calendar quarter and ending on the 15th day after the close of the calendar quarter.

**(9)** The Commission shall set filing dates for reports to be filed by principal campaign committees of candidates seeking election, or nomination for election, in special elections and political committees filing under paragraph (4)(A) which make contributions to or expenditures on behalf of a candidate or candidates in special elections. The Commission shall require no more than one pre-election report for

each election and one post-election report for the election which fills the vacancy. The Commission may waive any reporting obligation of committees required to file for special elections if any report required by paragraph (2) or (4) is required to be filed within 10 days of a report required under this subsection. The Commission shall establish the reporting dates within 5 days of the setting of such election and shall publish such dates and notify the principal campaign committees of all candidates in such election of the reporting dates.

**(10)** The treasurer of a committee supporting a candidate for the office of Vice President (other than the nominee of a political party) shall file reports in accordance with paragraph (3).

**(11)(A)** The Commission shall promulgate a regulation under which a person required to file a designation, statement, or report under this Act--

(i) is required to maintain and file a designation, statement, or report for any calendar year in electronic form accessible by computers if the person has, or has reason to expect to have, aggregate contributions or expenditures in excess of a threshold amount determined by the Commission; and

(ii) may maintain and file a designation, statement, or report in electronic form or an alternative form if not required to do so under the regulation promulgated under clause (i).

**(B)** The Commission shall make a designation, statement, report, or notification that is filed with the Commission under this Act available for inspection by the public in the offices of the Commission and accessible to the public on the Internet not later than 48 hours (or not later than 24 hours in the case of a designation, statement, report, or notification filed electronically) after receipt by the Commission.

**(C)** In promulgating a regulation under this paragraph, the Commission shall provide methods (other than requiring a signature on the document being filed) for verifying designations, statements, and reports covered by the regulation. Any document verified under any of the methods shall be treated for all purposes (including penalties for perjury) in the same manner as a document verified by signature.

**(D)** As used in this paragraph, the term "report" means, with respect to the Commission, a report, designation, or statement required by this Act to be filed with the Commission.

**(12)** Software for filing of reports

**(A)** In general

The Commission shall--

(i) promulgate standards to be used by vendors to develop software that--

(I) permits candidates to easily record information concerning receipts and disbursements required to be reported under this Act at the time of the receipt or disbursement;

(II) allows the information recorded under subclause (I) to be transmitted immediately to the Commission; and

(III) allows the Commission to post the information on the Internet immediately upon receipt; and

(ii) make a copy of software that meets the standards promulgated under clause (i) available to each person required to file a designation, statement, or report in electronic form under this Act.

**(B)** Additional information

To the extent feasible, the Commission shall require vendors to include in the software developed under the standards under subparagraph (A) the ability for any person to file any designation, statement, or report required under this Act in electronic form.

**(C)** Required use

Notwithstanding any provision of this Act relating to times for filing reports, each candidate for Federal office (or that candidate's authorized committee) shall use software that meets the standards promulgated under this paragraph once such software is made available to such candidate.

**(D)** Required posting

The Commission shall, as soon as practicable, post on the Internet any information received under this paragraph.

## 52 U.S.C. § 30106(c)
## Federal Election Commission

**(c) Voting requirements; delegation of authorities**

All decisions of the Commission with respect to the exercise of its duties and powers under the provisions of this Act shall be made by a majority vote of the members of the Commission. A member of the Commission may not delegate to any person his or her vote or any decisionmaking authority or duty vested in the Commission by the provisions of this Act, except that the affirmative vote of 4 members of the Commission shall be required in order for the Commission to take any action in

accordance with paragraph (6), (7), (8), or (9) of section 30107(a) of this title or with chapter 95 or chapter 96 of Title 26.

## 52 U.S.C. § 30107(a)
## Powers of Commission

**(a) Specific authorities**

The Commission has the power—

**(1)** to require by special or general orders, any person to submit, under oath, such written reports and answers to questions as the Commission may prescribe;

**(2)** to administer oaths or affirmations;

**(3)** to require by subpena, signed by the chairman or the vice chairman, the attendance and testimony of witnesses and the production of all documentary evidence relating to the execution of its duties;

**(4)** in any proceeding or investigation, to order testimony to be taken by deposition before any person who is designated by the Commission and has the power to administer oaths and, in such instances, to compel testimony and the production of evidence in the same manner as authorized under paragraph (3);

**(5)** to pay witnesses the same fees and mileage as are paid in like circumstances in the courts of the United States;

**(6)** to initiate (through civil actions for injunctive, declaratory, or other appropriate relief), defend (in the case of any civil action brought under section 30109(a)(8) of this title) or appeal any civil action in the name of the Commission to enforce the provisions of this Act and chapter 95 and chapter 96 of Title 26, through its general counsel;

**(7)** to render advisory opinions under section 30108 of this title;

**(8)** to develop such prescribed forms and to make, amend, and repeal such rules, pursuant to the provisions of chapter 5 of Title 5, as are necessary to carry out the provisions of this Act and chapter 95 and chapter 96 of Title 26; and

**(9)** to conduct investigations and hearings expeditiously, to encourage voluntary compliance, and to report apparent violations to the appropriate law enforcement authorities.

**52 U.S.C. § 30109(a)**
**Enforcement**

**(a) Administrative and judicial practice and procedure**

**(1)** Any person who believes a violation of this Act or of chapter 95 or chapter 96 of Title 26 has occurred, may file a complaint with the Commission. Such complaint shall be in writing, signed and sworn to by the person filing such complaint, shall be notarized, and shall be made under penalty of perjury and subject to the provisions of section 1001 of Title 18. Within 5 days after receipt of a complaint, the Commission shall notify, in writing, any person alleged in the complaint to have committed such a violation. Before the Commission conducts any vote on the complaint, other than a vote to dismiss, any person so notified shall have the opportunity to demonstrate, in writing, to the Commission within 15 days after notification that no action should be taken against such person on the basis of the complaint. The Commission may not conduct any investigation or take any other action under this section solely on the basis of a complaint of a person whose identity is not disclosed to the Commission.

**(2)** If the Commission, upon receiving a complaint under paragraph (1) or on the basis of information ascertained in the normal course of carrying out its supervisory responsibilities, determines, by an affirmative vote of 4 of its members, that it has reason to believe that a person has committed, or is about to commit, a violation of this Act or chapter 95 or chapter 96 of Title 26, the Commission shall, through its chairman or vice chairman, notify the person of the alleged violation. Such notification shall set forth the factual basis for such alleged violation. The Commission shall make an investigation of such alleged violation, which may include a field investigation or audit, in accordance with the provisions of this section.

**(3)** The general counsel of the Commission shall notify the respondent of any recommendation to the Commission by the general counsel to proceed to a vote on probable cause pursuant to paragraph (4)(A)(i). With such notification, the general counsel shall include a brief stating the position of the general counsel on the legal

12a

and factual issues of the case. Within 15 days of receipt of such brief, respondent may submit a brief stating the position of such respondent on the legal and factual issues of the case, and replying to the brief of general counsel. Such briefs shall be filed with the Secretary of the Commission and shall be considered by the Commission before proceeding under paragraph (4).

**(4)(A)(i)** Except as provided in clauses[1] (ii) and subparagraph (C), if the Commission determines, by an affirmative vote of 4 of its members, that there is probable cause to believe that any person has committed, or is about to commit, a violation of this Act or of chapter 95 or chapter 96 of Title 26, the Commission shall attempt, for a period of at least 30 days, to correct or prevent such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved. Such attempt by the Commission to correct or prevent such violation may continue for a period of not more than 90 days. The Commission may not enter into a conciliation agreement under this clause except pursuant to an affirmative vote of 4 of its members. A conciliation agreement, unless violated, is a complete bar to any further action by the Commission, including the bringing of a civil proceeding under paragraph (6)(A).

**(ii)** If any determination of the Commission under clause (i) occurs during the 45-day period immediately preceding any election, then the Commission shall attempt, for a period of at least 15 days, to correct or prevent the violation involved by the methods specified in clause (i).

**(B)(i)** No action by the Commission or any person, and no information derived, in connection with any conciliation attempt by the Commission under subparagraph (A) may be made public by the Commission without the written consent of the respondent and the Commission.

**(ii)** If a conciliation agreement is agreed upon by the Commission and the respondent, the Commission shall make public any conciliation agreement signed by both the Commission and the respondent. If the Commission makes a determination that a person has not violated this Act or chapter 95 or chapter 96 of Title 26, the Commission shall make public such determination.

**(C)(i)** Notwithstanding subparagraph (A), in the case of a violation of a qualified disclosure requirement, the Commission may—

    **(I)** find that a person committed such a violation on the basis of information obtained pursuant to the procedures described in paragraphs (1) and (2); and

**(II)** based on such finding, require the person to pay a civil money penalty in an amount determined, for violations of each qualified disclosure requirement, under a schedule of penalties which is established and published by the Commission and which takes into account the amount of the violation involved, the existence of previous violations by the person, and such other factors as the Commission considers appropriate.

**(ii)** The Commission may not make any determination adverse to a person under clause (i) until the person has been given written notice and an opportunity to be heard before the Commission.

**(iii)** Any person against whom an adverse determination is made under this subparagraph may obtain a review of such determination in the district court of the United States for the district in which the person resides, or transacts business, by filing in such court (prior to the expiration of the 30-day period which begins on the date the person receives notification of the determination) a written petition requesting that the determination be modified or set aside.

**(iv)** In this subparagraph, the term "qualified disclosure requirement" means any requirement of—

    **(I)** subsections[2] (a), (c), (e), (f), (g), or (i) of section 30104 of this title; or

    **(II)** section 30105 of this title.

**(v)** This subparagraph shall apply with respect to violations that relate to reporting periods that begin on or after January 1, 2000, and that end on or before December 31, 2023.

**(5)(A)** If the Commission believes that a violation of this Act or of chapter 95 or chapter 96 of Title 26 has been committed, a conciliation agreement entered into by the Commission under paragraph (4)(A) may include a requirement that the person involved in such conciliation agreement shall pay a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation.

**(B)** If the Commission believes that a knowing and willful violation of this Act or of chapter 95 or chapter 96 of Title 26 has been committed, a conciliation agreement entered into by the Commission under paragraph (4)(A) may require that the person

involved in such conciliation agreement shall pay a civil penalty which does not exceed the greater of $10,000 or an amount equal to 200 percent of any contribution or expenditure involved in such violation (or, in the case of a violation of section 30122 of this title, which is not less than 300 percent of the amount involved in the violation and is not more than the greater of $50,000 or 1,000 percent of the amount involved in the violation).

**(C)** If the Commission by an affirmative vote of 4 of its members, determines that there is probable cause to believe that a knowing and willful violation of this Act which is subject to subsection (d), or a knowing and willful violation of chapter 95 or chapter 96 of Title 26, has occurred or is about to occur, it may refer such apparent violation to the Attorney General of the United States without regard to any limitations set forth in paragraph (4)(A).

**(D)** In any case in which a person has entered into a conciliation agreement with the Commission under paragraph (4)(A), the Commission may institute a civil action for relief under paragraph (6)(A) if it believes that the person has violated any provision of such conciliation agreement. For the Commission to obtain relief in any civil action, the Commission need only establish that the person has violated, in whole or in part, any requirement of such conciliation agreement.

**(6)(A)** If the Commission is unable to correct or prevent any violation of this Act or of chapter 95 or chapter 96 of Title 26, by the methods specified in paragraph (4), the Commission may, upon an affirmative vote of 4 of its members, institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order (including an order for a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation) in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business.

**(B)** In any civil action instituted by the Commission under subparagraph (A), the court may grant a permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation, upon a proper showing that the person involved has committed, or is about to commit (if the relief sought is a permanent or temporary injunction or a restraining order), a violation of this Act or chapter 95 or chapter 96 of Title 26.

15a

**(C)** In any civil action for relief instituted by the Commission under subparagraph (A), if the court determines that the Commission has established that the person involved in such civil action has committed a knowing and willful violation of this Act or of chapter 95 or chapter 96 of Title 26, the court may impose a civil penalty which does not exceed the greater of $10,000 or an amount equal to 200 percent of any contribution or expenditure involved in such violation (or, in the case of a violation of section 30122 of this title, which is not less than 300 percent of the amount involved in the violation and is not more than the greater of $50,000 or 1,000 percent of the amount involved in the violation).

**(7)** In any action brought under paragraph (5) or (6), subpoenas for witnesses who are required to attend a United States district court may run into any other district.

**(8)(A)** Any party aggrieved by an order of the Commission dismissing a complaint filed by such party under paragraph (1), or by a failure of the Commission to act on such complaint during the 120-day period beginning on the date the complaint is filed, may file a petition with the United States District Court for the District of Columbia.

**(B)** Any petition under subparagraph (A) shall be filed, in the case of a dismissal of a complaint by the Commission, within 60 days after the date of the dismissal.

**(C)** In any proceeding under this paragraph the court may declare that the dismissal of the complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days, failing which the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint.

**(9)** Any judgment of a district court under this subsection may be appealed to the court of appeals, and the judgment of the court of appeals affirming or setting aside, in whole or in part, any such order of the district court shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.
**(10)** Repealed. Pub.L. 98-620, Title IV, § 402(1)(A), Nov. 8, 1984, 98 Stat. 3357

**(11)** If the Commission determines after an investigation that any person has violated an order of the court entered in a proceeding brought under paragraph (6), it may petition the court for an order to hold such person in civil contempt, but if it believes the violation to be knowing and willful it may petition the court for an order to hold such person in criminal contempt.

**(12)(A)** Any notification or investigation made under this section shall not be made public by the Commission or by any person without the written consent of the person receiving such notification or the person with respect to whom such investigation is made.

**(B)** Any member or employee of the Commission, or any other person, who violates the provisions of subparagraph (A) shall be fined not more than $2,000. Any such member, employee, or other person who knowingly and willfully violates the provisions of subparagraph (A) shall be fined not more than $5,000.

## 52 U.S.C. § 30116(a)(1), (a)(2), (f)
### Limitations on contributions and expenditures

**(a) Dollar limits on contributions**

**(1)** Except as provided in subsection (i) and section 30117 of this title, no person shall make contributions—

> **(A)** to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000;
>
> **(B)** to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $25,000, or, in the case of contributions made to any of the accounts described in paragraph (9), exceed 300 percent of the amount otherwise applicable under this subparagraph with respect to such calendar year;
>
> **(C)** to any other political committee (other than a committee described in subparagraph (D)) in any calendar year which, in the aggregate, exceed $5,000; or
>
> **(D)** to a political committee established and maintained by a State committee of a political party in any calendar year which, in the aggregate, exceed $10,000.

**(2)** No multicandidate political committee shall make contributions—

17a

**(A)** to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000;

**(B)** to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year, which, in the aggregate, exceed $15,000, or, in the case of contributions made to any of the accounts described in paragraph (9), exceed 300 percent of the amount otherwise applicable under this subparagraph with respect to such calendar year; or

**(C)** to any other political committee in any calendar year which, in the aggregate, exceed $5,000.

*    *    *

**(f) Prohibited contributions and expenditures**

No candidate or political committee shall knowingly accept any contribution or make any expenditure in violation of the provisions of this section. No officer or employee of a political committee shall knowingly accept a contribution made for the benefit or use of a candidate, or knowingly make any expenditure on behalf of a candidate, in violation of any limitation imposed on contributions and expenditures under this section.

**52 U.S.C. § 30118(a)**
**Contributions or expenditures by national banks, corporations, or labor organizations**

**(a) In general**

It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the

foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

## 52 U.S.C. § 30125(e)
## Soft Money of Political Parties

**(e) Federal candidates**

**(1) In general**

A candidate, individual holding Federal office, agent of a candidate or an individual holding Federal office, or an entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of 1 or more candidates or individuals holding Federal office, shall not—

**(A)** solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act; or

**(B)** solicit, receive, direct, transfer, or spend funds in connection with any election other than an election for Federal office or disburse funds in connection with such an election unless the funds-

**(i)** are not in excess of the amounts permitted with respect to contributions to candidates and political committees under paragraphs (1), (2), and (3) of section 30116(a) of this title; and

**(ii)** are not from sources prohibited by this Act from making contributions in connection with an election for Federal office.

**(2)** State law
Paragraph (1) does not apply to the solicitation, receipt, or spending of funds by an individual described in such paragraph who is or was also a candidate for a State or local office solely in connection with such election for State or local office if the solicitation, receipt, or spending of funds is permitted under State law and refers only

to such State or local candidate, or to any other candidate for the State or local office sought by such candidate, or both.

**(3)** Fundraising events

Notwithstanding paragraph (1) or subsection (b)(2)(C), a candidate or an individual holding Federal office may attend, speak, or be a featured guest at a fundraising event for a State, district, or local committee of a political party.

**(4)** Permitting certain solicitations

   **(A)** General solicitations

   Notwithstanding any other provision of this subsection, an individual described in paragraph (1) may make a general solicitation of funds on behalf of any organization that is described in section 501(c) of title 26 and exempt from taxation under section 501(a) of such title (or has submitted an application for determination of tax exempt status under such section) (other than an entity whose principal purpose is to conduct activities described in clauses (i) and (ii) of section 30101(20)(A) of this title) where such solicitation does not specify how the funds will or should be spent.

   **(B)** Certain specific solicitations

   In addition to the general solicitations permitted under subparagraph (A), an individual described in paragraph (1) may make a solicitation explicitly to obtain funds for carrying out the activities described in clauses (i) and (ii) of section 30101(20)(A) of this title, or for an entity whose principal purpose is to conduct such activities, if-

      **(i)** the solicitation is made only to individuals; and

      **(ii)** the amount solicited from any individual during any calendar year does not exceed $20,000.

## 11 C.F.R. § 100.72(b)
## Testing the waters

**(b)** Exemption not applicable to individuals who have decided to become candidates. This exemption does not apply to funds received for activities indicating that an individual has decided to become a candidate for a particular office or for activities relevant to conducting a campaign. Examples of

activities that indicate that an individual has decided to become a candidate include, but are not limited to:

**(1)** The individual uses general public political advertising to publicize his or her intention to campaign for Federal office.

**(2)** The individual raises funds in excess of what could reasonably be expected to be used for exploratory activities or undertakes activities designed to amass campaign funds that would be spent after he or she becomes a candidate.

**(3)** The individual makes or authorizes written or oral statements that refer to him or her as a candidate for a particular office.

**(4)** The individual conducts activities in close proximity to the election or over a protracted period of time.

**(5)** The individual has taken action to qualify for the ballot under State law.

## 11 C.F.R. § 100.131(b)
## Testing the waters

**(b)** Exemption not applicable to individuals who have decided to become candidates. This exemption does not apply to payments made for activities indicating that an individual has decided to become a candidate for a particular office or for activities relevant to conducting a campaign. Examples of activities that indicate that an individual has decided to become a candidate include, but are not limited to:

**(1)** The individual uses general public political advertising to publicize his or her intention to campaign for Federal office.

**(2)** The individual raises funds in excess of what could reasonably be expected to be used for exploratory activities or undertakes activities designed to amass campaign funds that would be spent after he or she becomes a candidate.

**(3)** The individual makes or authorizes written or oral statements that refer to him or her as a candidate for a particular office.

**(4)** The individual conducts activities in close proximity to the election or over a protracted period of time.

**(5)** The individual has taken action to qualify for the ballot under State law.

## 11 C.F.R. § 101.1(a)
## Candidate designations

**(a**) Principal Campaign Committee. Within 15 days after becoming a candidate under 11 CFR 100.3, each candidate, other than a nominee for the office of Vice President, shall designate in writing, a principal campaign committee in accordance with 11 CFR 102.12. A candidate shall designate his or her principal campaign committee by filing a Statement of Candidacy on FEC Form 2, or, if the candidate is not required to file electronically under 11 CFR 104.18, by filing a letter with the Commission containing the same information (that is, the individual's name and address, party affiliation, and office sought, the District and State in which Federal office is sought, and the name and address of his or her principal campaign committee). Each principal campaign committee shall register, designate a depository, and report in accordance with 11 CFR parts 102, 103, and 104.

## 11 C.F.R. § 109.21(a), (c), (d)
## What is a "coordinated communication"?

**(a)** Definition. A communication is coordinated with a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing when the communication:

**(1)** Is paid for, in whole or in part, by a person other than that candidate, authorized committee, or political party committee;

**(2)** Satisfies at least one of the content standards in paragraph (c) of this section; and

**(3)** Satisfies at least one of the conduct standards in paragraph (d) of this section.

22a

\*     \*     \*

**(c)** Content standards. Each of the types of content described in paragraphs (c)(1) through (c)(5) of this section satisfies the content standard of this section.

**(1)** A communication that is an electioneering communication under 11 CFR 100.29.

**(2)** A public communication, as defined in 11 CFR 100.26, that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate or the candidate's authorized committee, unless the dissemination, distribution, or republication is excepted under 11 CFR 109.23(b). For a communication that satisfies this content standard, see paragraph (d)(6) of this section.

**(3)** A public communication, as defined in 11 CFR 100.26, that expressly advocates, as defined in 11 CFR 100.22, the election or defeat of a clearly identified candidate for Federal office.

**(4)** A public communication, as defined in 11 CFR 100.26, that satisfies paragraph (c)(4)(i), (ii), (iii), or (iv) of this section:

**(i)** References to House and Senate candidates. The public communication refers to a clearly identified House or Senate candidate and is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's general, special, or runoff election, or primary or preference election, or nominating convention or caucus.

**(ii)** References to Presidential and Vice Presidential candidates. The public communication refers to a clearly identified Presidential or Vice Presidential candidate and is publicly distributed or otherwise publicly disseminated in a jurisdiction during the period of time beginning 120 days before the clearly identified candidate's primary or preference election in that jurisdiction, or nominating convention or caucus in that jurisdiction, up to and including the day of the general election.

**(iii)** References to political parties. The public communication refers to a political party, does not refer to a clearly identified Federal candidate, and is

publicly distributed or otherwise publicly disseminated in a jurisdiction in which one or more candidates of that political party will appear on the ballot.

> **(A)** When the public communication is coordinated with a candidate and it is publicly distributed or otherwise publicly disseminated in that candidate's jurisdiction, the time period in paragraph (c)(4)(i) or (ii) of this section that would apply to a communication containing a reference to that candidate applies;

> **(B)** When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated during the two-year election cycle ending on the date of a regularly scheduled non–Presidential general election, the time period in paragraph (c)(4)(i) of this section applies;

> **(C)** When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated during the two-year election cycle ending on the date of a Presidential general election, the time period in paragraph (c)(4)(ii) of this section applies.

**(iv)** References to both political parties and clearly identified Federal candidates. The public communication refers to a political party and a clearly identified Federal candidate, and is publicly distributed or otherwise publicly disseminated in a jurisdiction in which one or more candidates of that political party will appear on the ballot.

> **(A)** When the public communication is coordinated with a candidate and it is publicly distributed or otherwise publicly disseminated in that candidate's jurisdiction, the time period in paragraph (c)(4)(i) or (ii) of this section that would apply to a communication containing a reference to that candidate applies;

> **(B)** When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction, the time period in paragraph (c)(4)(i) or (ii) of this section that would apply to a communication containing only a reference to that candidate applies;

**(C)** When the public communication is coordinated with a political party committee and it is publicly distributed or otherwise publicly disseminated outside the clearly identified candidate's jurisdiction, the time period in paragraph (c)(4)(iii)(B) or (C) of this section that would apply to a communication containing only a reference to a political party applies.

**(5)** A public communication, as defined in 11 CFR 100.26, that is the functional equivalent of express advocacy. For purposes of this section, a communication is the functional equivalent of express advocacy if it is susceptible of no reasonable interpretation other than as an appeal to vote for or against a clearly identified Federal candidate.

**(d)** Conduct standards. Any one of the following types of conduct satisfies the conduct standard of this section whether or not there is agreement or formal collaboration, as defined in paragraph (e) of this section:

**(1)** Request or suggestion.

**(i)** The communication is created, produced, or distributed at the request or suggestion of a candidate, authorized committee, or political party committee; or

**(ii)** The communication is created, produced, or distributed at the suggestion of a person paying for the communication and the candidate, authorized committee, or political party committee assents to the suggestion.

**(2)** Material involvement. This paragraph, (d)(2), is not satisfied if the information material to the creation, production, or distribution of the communication was obtained from a publicly available source. A candidate, authorized committee, or political party committee is materially involved in decisions regarding:

**(i)** The content of the communication;

**(ii)** The intended audience for the communication;

**(iii)** The means or mode of the communication;

**(iv)** The specific media outlet used for the communication;

**(v)** The timing or frequency of the communication; or

**(vi)** The size or prominence of a printed communication, or duration of a communication by means of broadcast, cable, or satellite.

**(3)** Substantial discussion. This paragraph, (d)(3), is not satisfied if the information material to the creation, production, or distribution of the communication was obtained from a publicly available source. The communication is created, produced, or distributed after one or more substantial discussions about the communication between the person paying for the communication, or the employees or agents of the person paying for the communication, and the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee. A discussion is substantial within the meaning of this paragraph if information about the candidate's or political party committee's campaign plans, projects, activities, or needs is conveyed to a person paying for the communication, and that information is material to the creation, production, or distribution of the communication.

**(4)** Common vendor. All of the following statements in paragraphs (d)(4)(i) through (d)(4)(iii) of this section are true:

**(i)** The person paying for the communication, or an agent of such person, contracts with or employs a commercial vendor, as defined in 11 CFR 116.1(c), to create, produce, or distribute the communication;

**(ii)** That commercial vendor, including any owner, officer, or employee of the commercial vendor, has provided any of the following services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, during the previous 120 days:

   **(A)** Development of media strategy, including the selection or purchasing of advertising slots;

   **(B)** Selection of audiences;

   **(C)** Polling;

26a

**(D)** Fundraising;

**(E)** Developing the content of a public communication;

**(F)** Producing a public communication;

**(G)** Identifying voters or developing voter lists, mailing lists, or donor lists;

**(H)** Selecting personnel, contractors, or subcontractors; or

**(I)** Consulting or otherwise providing political or media advice; and

**(iii)** This paragraph, (d)(4)(iii), is not satisfied if the information material to the creation, production, or distribution of the communication used or conveyed by the commercial vendor was obtained from a publicly available source. That commercial vendor uses or conveys to the person paying for the communication:

**(A)** Information about the campaign plans, projects, activities, or needs of the clearly identified candidate, the candidate's opponent, or a political party committee, and that information is material to the creation, production, or distribution of the communication; or

**(B)** Information used previously by the commercial vendor in providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, and that information is material to the creation, production, or distribution of the communication.

**(5)** Former employee or independent contractor. Both of the following statements in paragraphs (d)(5)(i) and (d)(5)(ii) of this section are true:

**(i)** The communication is paid for by a person, or by the employer of a person, who was an employee or independent contractor of the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, during the previous 120 days; and

**(ii)** This paragraph, (d)(5)(ii), is not satisfied if the information material to the creation, production, or distribution of the communication used or conveyed by the former employee or independent contractor was obtained from a publicly available source. That former employee or independent contractor uses or conveys to the person paying for the communication:

> **(A)** Information about the campaign plans, projects, activities, or needs of the clearly identified candidate, the candidate's opponent, or a political party committee, and that information is material to the creation, production, or distribution of the communication; or

> **(B)** Information used by the former employee or independent contractor in providing services to the candidate who is clearly identified in the communication, or the candidate's authorized committee, the candidate's opponent, the opponent's authorized committee, or a political party committee, and that information is material to the creation, production, or distribution of the communication.

**(6)** Dissemination, distribution, or republication of campaign material. A communication that satisfies the content standard of paragraph (c)(2) of this section or 11 CFR 109.37(a)(2)(i) shall only satisfy the conduct standards of paragraphs (d)(1) through (d)(3) of this section on the basis of conduct by the candidate, the candidate's authorized committee, or the agents of any of the foregoing, that occurs after the original preparation of the campaign materials that are disseminated, distributed, or republished. The conduct standards of paragraphs (d)(4) and (d)(5) of this section may also apply to such communications as provided in those paragraphs.

### 11 C.F.R. § 300.2(c)
### Definitions

**(c)** Directly or indirectly establish, finance, maintain, or control.

**(1)** This paragraph (c) applies to national, State, district, and local committees of a political party, candidates, and holders of Federal office, including an officer, employee, or agent of any of the foregoing persons, which shall be referred to as "sponsors" in this section.

**(2)** To determine whether a sponsor directly or indirectly established, finances, maintains, or controls an entity, the factors described in paragraphs (c)(2)(i) through (x) of this section must be examined in the context of the overall relationship between sponsor and the entity to determine whether the presence of any factor or factors is evidence that the sponsor directly or indirectly established, finances, maintains, or controls the entity. Such factors include, but are not limited to:

**(i)** Whether a sponsor, directly or through its agent, owns controlling interest in the voting stock or securities of the entity;

**(ii)** Whether a sponsor, directly or through its agent, has the authority or ability to direct or participate in the governance of the entity through provisions of constitutions, bylaws, contracts, or other rules, or through formal or informal practices or procedures;

**(iii)** Whether a sponsor, directly or through its agent, has the authority or ability to hire, appoint, demote, or otherwise control the officers, or other decision-making employees or members of the entity;

**(iv)** Whether a sponsor has a common or overlapping membership with the entity that indicates a formal or ongoing relationship between the sponsor and the entity;

**(v)** Whether a sponsor has common or overlapping officers or employees with the entity that indicates a formal or ongoing relationship between the sponsor and the entity;

**(vi)** Whether a sponsor has any members, officers, or employees who were members, officers or employees of the entity that indicates a formal or ongoing relationship between the sponsor and the entity, or that indicates the creation of a successor entity;

**(vii)** Whether a sponsor, directly or through its agent, provides funds or goods in a significant amount or on an ongoing basis to the entity, such as through direct or indirect payments for administrative, fundraising, or other costs, but not including the transfer to a committee of its allocated share of proceeds jointly raised pursuant to 11 CFR 102.17, and otherwise lawfully;

29a

**(viii)** Whether a sponsor, directly or through its agent, causes or arranges for funds in a significant amount or on an ongoing basis to be provided to the entity, but not including the transfer to a committee of its allocated share of proceeds jointly raised pursuant to 11 CFR 102.17, and otherwise lawfully;

**(ix)** Whether a sponsor, directly or through its agent, had an active or significant role in the formation of the entity; and

**(x)** Whether the sponsor and the entity have similar patterns of receipts or disbursements that indicate a formal or ongoing relationship between the sponsor and the entity.

**(3)** Safe harbor. On or after November 6, 2002, an entity shall not be deemed to be directly or indirectly established, maintained, or controlled by another entity unless, based on the entities' actions and activities solely after November 6, 2002, they satisfy the requirements of this section. If an entity receives funds from another entity prior to November 6, 2002, and the recipient entity disposes of the funds prior to November 6, 2002, the receipt of such funds prior to November 6, 2002 shall have no bearing on determining whether the recipient entity is financed by the sponsoring entity within the meaning of this section.

**(4)** Determinations by the Commission.

**(i)** A sponsor or entity may request an advisory opinion of the Commission to determine whether the sponsor is no longer directly or indirectly financing, maintaining, or controlling the entity for purposes of this part. The request for such an advisory opinion must meet the requirements of 11 CFR part 112 and must demonstrate that the entity is not directly or indirectly financed, maintained, or controlled by the sponsor.

**(ii)** Notwithstanding the fact that a sponsor may have established an entity within the meaning of paragraph (c)(2) of this section, the sponsor or the entity may request an advisory opinion of the Commission determining that the relationship between the sponsor and the entity has been severed. The request for such an advisory opinion must meet the requirements of 11 CFR part 112, and must demonstrate that all material connections between the sponsor and the entity have been severed for two years.

**(iii)** Nothing in this section shall require entities that are separate organizations on November 6, 2002 to obtain an advisory opinion to operate separately from each other.