EN BANC ARGUMENT SCHEDULED FOR FEBRUARY 25, 2025

No. 22-5277

# In the United States Court of Appeals for the District of Columbia Circuit

END CITIZENS UNITED PAC,

*Plaintiff-Appellant,*

v.

FEDERAL ELECTION COMMISSION,

*Defendant-Appellee,*

NEW REPUBLICAN PAC,

*Intervenor-Defendant-Appellee.*

## EN BANC BRIEF OF INTERVENOR-APPELLEE

On Appeal from the United States District Court
for the District of Columbia (No. 1:21-cv-2128-RJL)

Jason B. Torchinsky
Edward M. Wenger
HOLTZMAN VOGEL
BARAN TORCHINSKY
& JOSEFIAK PLLC
2300 N St. NW, Ste. 643
Washington, DC 20037
*jtorchinsky@*
*holtzmanvogel.com*
*emwenger@*
*holtzmanvogel.com*
(202) 737-8808 (phone)

Mark I. Pinkert
HOLTZMAN VOGEL
BARAN TORCHINSKY
& JOSEFIAK PLLC
119 S. Monroe St.,
Ste. 500
Tallahassee, FL 32301
*mpinkert@*
*holtzmanvogel.com*
(850) 270-5938 (phone)

Paul D. Clement
Erin E. Murphy
CLEMENT & MURPHY,
PLLC
706 Duke Street
Alexandria, VA 22314
*paul.clement@*
*clementmurphy.com*
*erin.murphy@*
*clementmurphy.com*
(202) 742-8900 (phone)

*Counsel for Intervenor-Defendant-Appellee*

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

Under D.C. Circuit Rule 28(a)(1), Intervenor-Appellee New Republican PAC ("New Republican") submits its Certificate as to Parties, Rulings, and Related Cases.

**A.     Parties and *Amici*:** End Citizens United PAC was the plaintiff before the District Court and appears as Appellant before this Court. The Federal Election Commission was the named defendant before the District Court but never appeared before that court and is an Appellee before this Court. New Republican was an intervenor-defendant before the District Court and appears as Intervenor-Appellee before this Court. Citizens for Responsibility and Ethics in Washington ("CREW"), the Brennan Center for Justice at NYU School of Law and Election Law Scholars, and Professors of Administrative Law are *amici* for Appellant. The National Republican Senatorial Committee and National Republican Congressional Committee are *amici* for Appellee.

**B.     Rulings Under Review:** End Citizens United appeals the September 16, 2022 memorandum opinion (ECF 36) and order (ECF 37) of the United States District Court for the District of Columbia (Leon, J.) in Civil Action No. 1:21-cv-128, granting intervenor-defendant New Republican's Cross-Motion for Summary Judgment and denying Plaintiff End Citizens United's Motion for Default Judgment, or, in the Alternative, for Summary Judgment. The September 16, 2022

memorandum opinion is not published in the Federal Reporter but can be found in the Joint Appendix ("JA") at 097–113.

A panel of this Court affirmed the District Court's September 16, 2022 judgment on January 19, 2024. The panel opinion was published in the Federal Reporter at 90 F.4th 1172. This Court vacated the panel's judgment and granted End Citizens United's petition for rehearing en banc in an October 15, 2024 per curiam order.

**C.      Related Cases:** The appealed ruling has not previously been before this Court or any other court. A related case, *Campaign Legal Center v. FEC*, No. 22-5339 (D.C. Cir.), is pending before this Court. On October 15, 2024, the Court held that case in abeyance pending the disposition of this case. Counsel for Intervenor-Appellee is unaware of any other related cases pending in this Court or any other court.

## CORPORATE DISCLOSURE STATEMENT

New Republican certifies, under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, that it has no parent companies, subsidiaries, or affiliates. New Republican has no outstanding securities in the hands of the public, and no company possesses a 10% or greater ownership interest in New Republican. New Republican is registered with the Federal Election Commission as an independent-expenditure-only political committee, more commonly known as a "Super PAC," whose purpose is to help rebrand the Republican Party in favor of a framework consistent with conservative principles.

*/s/ Jason B. Torchinsky*
ATTORNEY

## TABLE OF CONTENTS

Certificate as to Parties, Rulings & Related Cases ................................... i

Corporate Disclosure Statement ................................................... iii

Table of Contents ............................................................... iv

Table of Authorities ............................................................. vi

Introduction .................................................................... 1

Statement of Jurisdiction.......................................................... 4

Statement of the Issues........................................................... 5

Statement of the Case ............................................................ 6

    A.    Prosecutorial Discretion Is a Core Executive Function Not Suited for Judicial Review. ...................................................... 6

    B.    FECA and the FEC................................................ 8

    C.    Procedural History................................................ 12

Summary of the Argument........................................................ 15

Article III Standing .............................................................. 17

    A.    ECU Lacks "Informational Standing." ............................... 18

    B.    ECU Lacks "Competitor Standing." ................................. 21

    C.    ECU Has Not Established That Any Injury It Suffered Could Be Redressed by These Proceedings. ................................... 23

Standard of Review.............................................................. 25

I.    FECA Does Not Empower Courts to Review an FEC Determination to Exercise Its Prosecutorial Discretion to Dismiss a Complaint..................... 26

    A.    An FEC Exercise of Prosecutorial Discretion Cannot Be "Contrary to Law" Under FECA............................................... 26

    B.    An FEC Exercise of Prosecutorial Discretion Does Not Become Reviewable Just Because the Commissioners Deadlocked or Considered the Merits. ........................................... 34

        1.    FECA does not differentiate between deadlock and majority-vote dismissals. ................................................ 34

iv

2.     A decision to dismiss based on prosecutorial discretion does not become reviewable just because it contains some legal analysis. ..........................................................................................36

II.     ECU's Policy Arguments Are at Odds with Congress's Judgments in FECA's Carefully Crafted Enforcement Scheme.........................................................41

III.     *Orloski*'s Authorization of Arbitrary-and-Capricious Review Conflicts with the Plain Text of FECA and Has No Basis in Precedent..............................48

A.     FECA's "Contrary to Law" Standard Does Not Encompass Arbitrary-and-Capricious Review or Abuse-of-Discretion Review...................48

B.     *Orloski* Did Not Purport to Interpret FECA's Citizen-Suit Provision and Is Not Grounded in Precedent. ....................................................51

C.     In Any Event, ECU Could Not Prevail Even Under *Orloski*..............53

Conclusion ........................................................................................................55

Certificate of Compliance ................................................................................56

Certificate of Service ........................................................................................57

v

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*ACLU v. U.S. DOJ*,
  655 F.3d 1 (D.C. Cir. 2011) ...............................................................................25

*Balt. Gas & Elec. Co. v. FERC*,
  252 F.3d 456 (D.C. Cir. 2001) ...........................................................................29

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) ...........................................................................................41

*Campaign Legal Ctr. v. 45Committee, Inc.*,
  118 F.4th 378 (D.C. Cir. 2024) .........................................................................27

*Campaign Legal Ctr. v. FEC*,
  31 F.4th 781 (D.C. Cir. 2022) ...........................................................................18

*Chamber of Com. v. EPA*,
  642 F.3d 192, 199 (D.C. Cir. 2011)....................................................................40

*Citizens for Responsibility & Ethics in Wash. & Noah Bookbinder v. FEC*,
  55 F.4th 918 (D.C. Cir. 2022)........................................................................5, 42

*Citizens for Responsibility & Ethics in Wash. v. FEC*,
  401 F. Supp. 2d 115 (D.D.C. 2005) .......................................................20, 21, 25

*Citizens for Responsibility & Ethics in Wash. v. FEC*,
  475 F.3d 337 (D.C. Cir. 2007) ....................................................................23, 24

*Citizens for Responsibility & Ethics in Wash. v. FEC*,
  892 F.3d 434 (D.C. Cir. 2018) ..............................................................11, 39, 40

*Citizens for Responsibility & Ethics in Wash. v. FEC*,
  923 F.3d 1141 (D.C. Cir. 2019) ....................................................................11, 34

*Citizens for Responsibility & Ethics v. FEC*,
  993 F.3d 880 (D.C. Cir. 2021) ...........................................................................11

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...............................................................1, 5, 8, 15, 27, 31

*Coker v. Sullivan*,
  902 F.2d 84 (D.C. Cir. 1990) ............................................................................28

*Comcast Corp. v. FCC*,
    526 F.3d 763 (D.C. Cir. 2008) ...............................................................38

*Common Cause v. FEC*,
    108 F.3d 413 (D.C. Cir. 1997) ...............................................18, 20, 25

*Common Cause v. FEC*,
    842 F.2d 436 (D.C. Cir. 1988) ...............................................................42

*Common Cause v. FEC*,
    489 F. Supp. 738 (D.D.C. 1980) ...........................................................33

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) ...............................................................................49

*Crossroads Grassroots Policy Strategies v. FEC*,
    788 F.3d 312 (D.C. Cir. 2015) ...............................................................10

*Democratic Cong. Campaign Comm. v. FEC*,
    831 F.2d 1131 (D.C. Cir. 1987) ...............................................11, 39, 43

*DOT v. Ass'n of Am. R.R.s*,
    575 U.S. 43, 62 (2015) ...........................................................................46

*Drake v. FAA*,
    291 F.3d 59 (D.C. Cir. 2002) ...........................................................26, 29

*El Paso Nat'l Gas Co. v. FERC*,
    50 F.3d 23 (D.C. Cir. 1995) ...................................................................22

*End Citizens United PAC v. FEC*,
    90 F.4th 1172 (D.C. Cir. 2024) ...............................................15, 40, 47, 48

*End Citizens United Pac. v. FEC*,
    No. 22-5277, 2024 WL 4524248 (D.C. Cir. Oct. 15, 2024) ................15

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ...............................................................................35

*FCC v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003) ...............................................................................48

*FEC v. Akins*,
    524 U.S. 11 (1998) ...............................................................18, 29, 32, 40

*FEC v. Democratic Senatorial Campaign Comm.*,
454 U.S. 27 (1981) ...................................................................50, 51, 52

*FEC v. Nat'l Republican Senatorial Comm.*,
966 F.2d 1471 (D.C. Cir. 1992) ..........................................................11

*FEC v. Nat'l Rifle Ass'n*,
553 F. Supp. 1331 (D.D.C. 1983) ........................................................38

*FEC v. NRA Political Victory Fund*,
513 U.S. 88 (1994) ...............................................................................47

*FEC v. Rose*,
806 F.2d 1081 (D.C. Cir. 1986) ..........................................................24

*Free Speech for People v. FEC*,
442 F. Supp. 3d 335 (D.D.C. 2020) ...............................................19, 20

*Freeman v. Quicken Loans, Inc.*,
566 U.S. 624 (2012) .............................................................................41

*Friedman v. FAA*,
841 F.3d 537 (D.C. Cir. 2016) ............................................................38

*FTC v. Invention Submission Corp.*,
965 F.2d 1086 (D.C. Cir. 1992) .....................................................38, 39

*Gottlieb v. FEC*,
143 F.3d 618 (D.C. Cir. 1998) ............................................................21

*Hagelin v. FEC*,
411 F.3d 237 (D.C. Cir. 2005) ............................................................53

*Hassan v. FEC*,
893 F. Supp. 2d 248 (D.D.C. 2012) ....................................................23

*Heckler v. Chaney*,
470 U.S. 821 (1985) ......................................... 1, 3, 7, 8, 26, 29, 37, 54

*Holland v. Nat'l Mining Ass'n*,
309 F.3d 808 (D.C. Cir. 2002) ............................................................48

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) ..............................................................6

*In re Carter-Mondale Reelection Comm., Inc.*,
 642 F.2d 538 (D.C. Cir. 1980) ....................................................51, 52

*Interstate Commerce Com v. Bhd. of Locomotive Eng'rs*,
 482 U.S. 270 (1987) ..........................................................................7

*Landstar Express Am., Inc. v. FMC*,
 569 F.3d 493 (D.C. Cir. 2009) ........................................................41

*Lincoln v. Vigil*,
 508 U.S. 182 (1993) ...................................................................7, 8, 26

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ........................................................................18

*Mil. Toxics Project v. EPA*,
 146 F.3d 948 (D.C. Cir. 1998) ........................................................48

*N.Y. State Dep't of Law v. FCC*,
 984 F.2d 1209 (D.C. Cir. 1993) ......................................................24

*Nader v. FEC*,
 725 F.3d 226 (D.C. Cir. 2013) ........................................................23

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
 551 U.S. 644 (2007) ........................................................................49

*Nat'l Law Party of the U.S. v. FEC*,
 111 F. Supp. 2d 33 (D.D.C. 2000) ..................................................23

*Nat'l Taxpayers Union v. United States*,
 68 F.3d 1428 (D.C. Cir. 1995) ........................................................21

*Norfolk S. Ry. v. Sorrell*,
 549 U.S. 158 (2007) ...................................................................35, 41

*Orloski v. FEC*,
 795 F.2d 156 (D.C. Cir. 1986) .....................................................5, 48

*Pa. Dep't of Corrs. v. Yeskey*,
 524 U.S. 206 (1998) ........................................................................35

*Parker Drilling Mgmt. Servs. v. Newton*,
 587 U.S. 601 (2019) ........................................................................30

*Pub. Citizen, Inc. v. FERC*,
  839 F.3d 1165 (D.C. Cir. 2016) ..................................................9, 10, 11

*Rapanos v. United States*,
  547 U.S. 715 (2006) ...................................................................53

*Russello v. United States*,
  464 U.S. 16 (1983) .....................................................................50

*Scheduled Airlines Traffic Offices v. DOD*,
  87 F.3d 1356 (D.C. Cir. 1996) ....................................................48

*Schieber v. United States*,
  77 F.4th 806 (D.C. Cir. 2023) ...............................................8, 27

*Sec'y of Labor v. Twentymile Coal Co.*,
  456 F.3d 151 (D.C. Cir. 2006) ....................................................29

*Shays v. FEC*,
  414 F.3d 76 (D.C. Cir. 2005) ................................................22, 23

*Shoshone-Bannock Tribes v. Reno*,
  56 F.3d 1476 (D.C. Cir. 1995) ...............................................28, 29

*Telecomms. Rsch. & Action Center v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ......................................................31

*TransUnion L.L.C. v. Ramirez*,
  594 U.S. 413 (2021) ...................................................................20

*United States v. Armstrong*,
  517 U.S. 456 (1996) ...................................................................38

*United States v. Fokker Servs. B.V.*,
  818 F.3d 733 (D.C. Cir. 2016) ......................................................7

*United States v. Mitchell*,
  39 F.3d 465 (4th Cir. 1994) .........................................................30

*United States v. Nixon*,
  418 U.S. 683 (1974) ..................................................................1, 6

*United States v. Texas*,
  599 U.S. 670 (2023) ................................................................7, 25

*Wayte v. United States*,
   470 U.S. 598 (1985) ...........................................................37

*Wertheimer v. FEC*,
   268 F.3d 1070 (D.C. Cir. 2001) .............................................18, 19, 20

## Constitution & Statutes

U.S. Const. art. II, § 3 .......................................................1, 6, 46

19 U.S.C. § 1330 ..............................................................35

26 U.S.C. § 9011 ...........................................................52, 53

28 U.S.C. § 1291 ...............................................................5

28 U.S.C. § 1331 ...............................................................4

5 U.S.C. § 706 ................................................................49

52 U.S.C. § 30101 ..............................................................8

52 U.S.C. § 30106 ..............................................................9

52 U.S.C. § 30107 ..............................................................9

52 U.S.C. § 30109 ........ 1, 5, 9, 10, 11, 12, 14, 25, 27, 30, 31, 32, 34, 36, 43, 48, 49

52 U.S.C. § 30143 ..............................................................8

## Other

11 C.F.R. § 111.7 ..............................................................9

120 Cong. Rec. 27,473 (Aug. 8, 1974) (remarks of Rep. Mathis) ........................43

125 Cong. Rec. 36,754 (Dec. 18, 1979) (statement of Sen. Pell)............................43

Bradley A. Smith & Stephen M. Hoersting, *A Toothless Anaconda: Innovation, Impotence and Overenforcement at the Federal Election Commission*,
   1 Election L.J. 145, 154 (2002) ..........................................................44

Bradley Smith, *FEC Shows How (and Why) Bipartisanship Can Still Work*, The Hill
   (Feb. 16, 2024), https://thehill.com/opinion/4471945-fec-shows-how-and-why-
   bipartisanship-can-still-work/......................................................... 45, 46

The Federalist No. 47 (James Madison) (Clinton Rossiter ed., rev. ed. 1999) .........6

Todd Lochner & Bruce E. Cain, *Equity and Efficacy in the Enforcement of Campaign Finance Laws*, 77 Tex. L. Rev. 1891 (1999) ..................................................................44

## INTRODUCTION

The Constitution entrusts the Executive with the duty to "take Care that the Laws be faithfully executed." U.S. CONST., art. II, § 3. That charge has long been understood to vest the Executive with "exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). Courts are thus tremendously reluctant to review an executive agency's exercise of prosecutorial discretion. *Heckler v. Chaney*, 470 U.S. 821 (1985). To be sure, Congress is not powerless to impose constraints on how the Executive may exercise that discretion, but to do so, it must establish a meaningful legal standard to guide both the agency and the courts. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). Without clear "law to apply," *id.* at 410, courts do not have the tools to second-guess how an agency balances its enforcement priorities, resource constraints, backlogs, and the many other factors that inform which cases to pursue.

The Federal Election Campaign Act ("FECA") does not depart from the tradition of leaving enforcement discretion to the branch charged with enforcing the law. FECA authorizes limited judicial review of a decision by the Federal Election Commission ("FEC") to dismiss a third-party administrative complaint, permitting courts to assess whether it was "contrary to law." 52 U.S.C. § 30109(a)(8). But that standard presumes the existence of some positive law that a dismissal could violate. Congress has established positive law about what does and does not constitute a

violation of FECA. But Congress has not imposed any constraints on how the FEC may exercise its inherent discretion to decide which third-party complaints warrant an expenditure of its limited resources. As this Court has repeatedly recognized, FECA sensibly leaves those sensitive decisions to the Commission, which is far better equipped than courts to make them.

While End Citizens United ("ECU") asks this Court to upend that precedent, never once in roughly fifty pages of briefing does it explain how a court could assess whether the Commission acted "contrary to law" by exercising its discretion not to pursue an enforcement action. Nor could it, as FECA simply does not provide tools for courts to conduct that inquiry—because Congress did not expect courts to do so. Take this case. The Commissioners whose votes controlled the decision to dismiss ECU's complaint explained that they did not consider it the best use of the Commission's resources because it "would have necessitated a wide-ranging, costly, and invasive investigation," racing against a fast-approaching statute of limitations, and diverting considerable resources away from a "substantial backlog of cases." JA290. ECU identifies no legal standard against which a court could even try to judge the propriety of that reasoning, because FECA supplies none.

That the Commission may sometimes engage in preliminary legal analysis when exercising its enforcement discretion (as it did here) does not change the analysis. If the FEC dismisses a complaint because it concludes that it lacks the

2

*power* to pursue it, that is a legal conclusion subject to "contrary to law" review. But an agency does not and cannot act "contrary to law" by factoring the strength of a case into whether it is worth pursuing. To the contrary, an agency's assessment of "whether [it] is likely to succeed" is a traditional and critical component of enforcement discretion, *Chaney*, 470 U.S. at 831, because the difficulty of a case impacts the volume of resources the agency will exhaust, the risk of creating bad precedent, and so on. Those considerations are thus reasonable even if an agency thinks it should succeed, as litigation always entails some degree of risk. And courts are no better equipped to assess whether the agency put too little or too much weight on that factor than they are to assess the weight given to any other traditional enforcement-discretion factor. After all, the fact that one judge or panel of judges thinks the FEC has a strong case hardly means the Commission acted "contrary to law" by factoring in the risk that another judge may see things differently.

Unable to identify anything in FECA that empowers courts to review exercises of enforcement discretion, ECU devotes much of its brief to complaining about FEC deadlock, which it views as a "partisan" obstacle to sufficiently "robust" enforcement of FECA that courts should step in to remove. But Congress did not craft FECA to prioritize enforcement at all costs. To the contrary, FECA is unusual in that it is crafted to make it especially *hard* for the FEC to bring enforcement actions, as the Commission is evenly divided along partisan lines, and it takes four votes to

3

authorize an enforcement action. Deadlock is thus a feature, not a bug, of FECA: Congress did not *want* the Commission to be able to pursue an enforcement action at the behest of a third party unless it could secure bipartisan support. That makes eminent sense; the statute does, after all, operate in the constitutionally sensitive realm of core First Amendment activity. Empowering courts to second-guess decisions not to pursue enforcement actions at the behest of third parties—which are themselves often politically motivated—adds a double layer of constitutional sensitivity given the separation-of-powers concerns with incursion into the Executive's charge to enforce the law. ECU may not agree with Congress's decision to err on the side of protecting First Amendment activity, but that is a gripe to take up with Congress, not an excuse for this Court to rejigger the careful balance that FECA strikes. This Court should reaffirm its precedent recognizing the limited scope of judicial review under FECA and affirm the district court's dismissal of ECU's petition.

## STATEMENT OF JURISDICTION

ECU sued Defendant-Appellee FEC in the U.S. District Court for the District of Columbia under 28 U.S.C. § 1331 and 52 U.S.C. § 30109(a)(8)(A). The district court held that the FEC's exercise of prosecutorial discretion to dismiss ECU's first administrative complaint against New Republican was not reviewable. *See* JA107–

108 (citing *CREW v. FEC*, 993 F.3d 880, 889 (D.C. Cir. 2021) ("*New Models I*"),

*reh'g denied per curiam*, 55 F.4th 918, 919 (D.C. Cir. 2022) ("*New Models II*")).[1]

ECU filed this appeal on October 17, 2022, within sixty days of the district court's Memorandum Opinion and Order entered September 16, 2022, which disposed of all of ECU's claims in this action. This Court has jurisdiction under 28 U.S.C. § 1291 and 52 U.S.C. § 30109(a)(9). However, ECU lacks Article III standing for the reasons below.

## STATEMENT OF THE ISSUES

1.    FECA provides for judicial review of an FEC administrative-complaint dismissal solely to assess whether the dismissal was "contrary to law." 52 U.S.C. § 30109(a)(8). When the FEC dismisses a complaint because of prosecutorial discretion, weighing variables like resource constraints and enforcement priorities, it does not apply any "law." *Overton Park*, 401 U.S. at 410. Is an FEC non-enforcement decision based on prosecutorial discretion judicially reviewable under FECA?

2.    Congress and courts have treated contrary-to-law review as distinct from arbitrary-and-capricious and abuse-of-discretion review. In *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986), this Court held—without explanation or

---

[1] For ease of reference, this brief adopts the same case-naming convention by ECU in its brief.

analysis—that the term "contrary to law" encompasses arbitrary-and-capricious and abuse-of-discretion review, even though Congress chose not to include those phrases in FECA. Was *Orloski* correctly decided?

## STATEMENT OF THE CASE

### A.    Prosecutorial Discretion Is a Core Executive Function Not Suited for Judicial Review.

The Constitution entrusts the Executive with the duty to "take Care that the Laws be faithfully executed." U.S. CONST., art. II, § 3. The "Take Care Clause," in conjunction with the "Executive Power Clause," "Oath of Office Clause," and "Pardon Clause," has long been interpreted to vest the Executive with the "power of prosecutorial discretion." *In re Aiken Cnty.*, 725 F.3d 255, 262–63 (D.C. Cir. 2013). In short, "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *Nixon*, 418 U.S. at 693.

While a "decision to exercise prosecutorial discretion and to decline to seek charges against violators (or to pardon violators) of certain laws can be very controversial," this discretion is a feature—not a bug—of our constitutional system. *In re Aiken Cnty.*, 725 F.3d at 265. It "has been settled since the Founding" that "[t]he Executive's broad prosecutorial discretion and pardon powers illustrate a key point of the Constitution's separation of powers." *Id.* at 263–64; *see also* THE FEDERALIST NO. 47, at 269 (James Madison) (Clinton Rossiter ed., rev. ed. 1999). And because prosecution is a core executive function, "'judicial authority is . . . at

6

its most limited' when reviewing the Executive's exercise of discretion" over prosecutorial matters. *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (quotation omitted).

In *Heckler v. Chaney*, the Supreme Court detailed its long tradition of declining to review an "agency's decision not to prosecute or enforce, whether through civil or criminal process." 470 U.S. at 831 (collecting cases). As the Court explained, an "agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 831. And "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32; *see also United States v. Texas*, 599 U.S. 670, 680 (2023) ("In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors."); *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987); *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993).

To be sure, the presumption of prosecutorial-discretion non-reviewability may be rebutted—but only "where the substantive statute has provided guidelines for the

agency to follow in exercising its enforcement powers." *Chaney*, 470 U.S. at 832–33. Congress can rebut the presumption by (1) "setting substantive [enforcement] priorities," or (2) "circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. But if Congress has done neither, that not only manifests its intent to leave enforcement-discretion decisions with the agency, but also leaves an Article III court with no "law to apply." *Overton Park*, 401 U.S. at 413. And without law to apply, Article III courts cannot engage in meaningful judicial review. *Id.*; *see also Lincoln*, 508 U.S. at 193; *Schieber v. United States*, 77 F.4th 806, 813–14 (D.C. Cir. 2023).

### B.    FECA and the FEC

In 1971, Congress enacted FECA, 52 U.S.C. §§ 30101 *et seq.*, a comprehensive federal campaign-finance regulatory scheme. Among other things, FECA establishes candidate-reporting requirements and sets federal campaign-finance constraints. Congress amended FECA in 1974, in response to the Watergate scandal, *see* Federal Election Campaign Amendments Act of 1974, Pub. L. 93-443, § 301, 88 Stat. 1263, 1289 (1974), *as codified*, 52 U.S.C. § 30143(a), creating the FEC as the regulatory agency to fill the enforcement gap left in the 1971 statute.

The FEC is an unusually structured federal agency. It has six Commissioners, but no more than three can come from a single political party, meaning a full Commission will always be divided on partisan lines. *See* 52 U.S.C. § 30106(a)(1).

And "[a]ll decisions of the Commission with respect to the exercise of its duties and powers" must "be made by a majority vote of the members of the Commission"—*i.e.*, the vote of "4 members of the Commission shall be required in order for the Commission" to initiate civil actions, render opinions, promulgate regulations, or conduct investigations. *Id*. § 30106(c); *id.* § 30107(a)(6)–(9). In that respect, "Congress uniquely structured the FEC toward maintaining the status quo," as "[t]he voting and membership requirements mean that, unlike other agencies— where deadlocks are rather atypical—FEC will regularly deadlock as part of its *modus operandi*." *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1171 (D.C. Cir. 2016).

FECA allows citizens to file administrative complaints with the Commission alleging that someone has violated the Act. 52 U.S.C. § 30109(a)(1). But pursuing a third-party complaint likewise requires the bipartisan support of four Commissioners. Upon receiving an administrative complaint, the FEC's General Counsel reviews the complaint and responses submitted and makes a recommendation to the Commissioners. *See* 11 C.F.R. § 111.7(a). The Commissioners then vote on whether there is "reason to believe" FECA has been violated. *See* 52 U.S.C. § 30109(a)(2). If at least four of six Commissioners vote to find "reason to believe," the FEC "make[s] an investigation of such alleged violation." *Id*. But if fewer than four Commissioners vote to find "reason to believe," no investigation is authorized,

*id.*, and "the FEC dismisses the administrative complaint." *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 315 (D.C. Cir. 2015); *Pub. Citizen*, 839 F.3d at 1170. By design, then, the Commission cannot pursue a third-party complaint if it is deadlocked, whether along partisan lines or otherwise.

That deadlock dynamic persists through the process of deciding whether to pursue an enforcement action. If the FEC votes to initiate an investigation, it will not proceed beyond that phase unless at least four Commissioners vote that there is "probable cause" to believe a violation occurred after the investigation concludes. 52 U.S.C. § 30109(a)(4)(A)(i). If four Commissioners do find "probable cause," then the FEC must attempt informal conciliation with the target of the complaint before pursuing an enforcement action. *Id*. A conciliation agreement likewise takes four votes to approve. *Id.* The Commission "may" institute a civil action if, after finding probable cause, the agency is unable to reach a conciliation agreement with the respondent. *Id.* § 30109(a)(6)(A). At that point, the FEC may sue to enforce its findings. The decision to file the civil lawsuit requires four votes. *Id.* And while FECA establishes notice and response requirements that must be met before the FEC may take a reason-to-believe or probable-cause vote, Congress imposed no substantive limits on what discretionary factors the FEC may consider when deciding whether to dismiss a complaint. *Pub. Citizen*, 839 F.3d at 1170–71.

When the FEC dismisses a complaint, or it fails to act on a complaint in 120

days, a "party aggrieved" may file a petition with the U.S. District Court for the District of Columbia. *See* 52 U.S.C. § 30109(a)(8)(A). But while this Court requires the Commission to issue a "statement of reasons" for dismissing a complaint when it "does not act in conformity with its General Counsel's reading of Commission precedent," *DCCC v. FEC*, 831 F.2d 1131, 1132 (D.C. Cir. 1987), FECA authorizes only limited judicial review: a court may review the FEC's dismissal (or failure to act) only for whether it was "contrary to law." *Id.* § 30109(a)(8)(C).[2] And under this Court's precedent, "contrary to law" review does not encompass review of a decision to dismiss an administrative complaint in whole or in part as an exercise of enforcement discretion. *See CREW v. FEC*, 892 F.3d 434 (D.C. Cir. 2018) ("*Commission on Hope I*"), *reh'g denied per curiam*, 923 F.3d 1141 (D.C. Cir. 2019) ("*Commission on Hope II*"); *New Models I*, 993 F.3d at 882.

If a court concludes that a dismissal or failure to act was "contrary to law," then it may "direct the Commission to conform with such declaration within 30 days." 52 U.S.C. § 30109(a)(8)(C). If the Commission fails to do so, then "the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint." *Id.* But unless the Commission

---

[2] Although the "*DCCC* opinion limited itself to its facts," this Court has "since expanded it to control generally situations in which the Commission deadlocks and dismisses." *FEC v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471, 1476 (D.C. Cir. 1992).

acts "contrary to law," its decision not to pursue an enforcement action bars a third party from stepping in and pursuing an action of its own. A private party thus cannot override the Commission's decision not to pursue a complaint in an exercise of its enforcement discretion.

## C.    Procedural History

1. In April 2018, ECU filed an administrative complaint against then-U.S. Senate candidate Rick Scott and New Republican, a PAC that Scott chaired before he became a candidate for federal office. JA118–22. ECU alleged that, because of his previous role as New Republican's chairman, then-Governor Scott became a U.S. Senate candidate months before he officially announced his candidacy on April 9, 2018. JA118–19. Based on media reports, whisperings of "political strategists," and objections to then-Governor Scott's fundraising (JA17), ECU surmised that, if he became a candidate before he said he did, then he must not have filed the FEC-required paperwork on time. The FEC designated this complaint Matter Under Review ("MUR") No. 7370. JA118.

Months later, ECU filed a second complaint, alleging that two TV ads released by New Republican in May and June 2018 were "created, produced, or distributed at the request or suggestion of candidate Rick Scott." JA181. The FEC designated this complaint MUR No. 7496. JA175. New Republican submitted an affidavit from its Executive Director denying then-Governor Scott's involvement.

JA188–89.

2. Upon review, the Commission's General Counsel recommended that the Commissioners find reason to believe that Respondents violated FECA as alleged in MUR No. 7370. The General Counsel recommended that the Commission take no action on MUR No. 7496. JA210.

The Commission voted three-to-three on the administrative complaints at the "reason to believe" stage, resulting in dismissal of both MURs. Following that deadlocked vote, the Commission voted five-to-one to close the file. In accordance with this Court's precedent, the three "Controlling Commissioners"—*i.e.*, the three who voted against finding reason to believe there was a violation—filed a Statement of Reasons for their votes explaining why, in their view, "neither the wise use of Commission resources nor the available evidence supported" the "sweeping approach" suggested by the General Counsel. JA282.

After recounting ECU's allegations and examining the General Counsel's recommendations, the Controlling Commissioners determined that "this Matter merited the invocation of our prosecutorial discretion." JA290. Because "[t]he only significant evidence of Scott's potential earlier candidacy was predicated on the fundraising and operational activities that occurred during his seven-month term as Chair," they reasoned that "prob[ing] his subjective intent during this period would have necessitated a wide-ranging, costly, and invasive investigation into both Scott

and New Republican's activities during that period of time, and possibly after." *Id.* Considering the FEC's "substantial backlog of cases," a soon-expiring statute of limitations, and the "thin evidentiary reed" offered by ECU, the Controlling Commissioners chose to "invoke[] [the Agency's] prosecutorial discretion pursuant to *Heckler v. Chaney*." *Id.* And they voted to dismiss ECU's TV ad coordination complaint "for lack of evidence." JA291.

3. On August 9, 2021, ECU sued the FEC, alleging that its complaints established reason to believe then-Governor Scott and New Republican committed campaign-finance violations, and that the Commission acted "contrary to law" in declining to act on the administrative complaints. JA24–25. The district court found that New Republican[3] was "entitled to summary judgment because the FEC's dismissal of ECU's first complaint was an unreviewable exercise of prosecutorial discretion and its dismissal of ECU's second complaint was reasonable." JA97–98.

Regarding ECU's first complaint (MUR No. 7370), the court concluded that "the FEC's decision to invoke its prosecutorial discretion in declining to investigate those claims is an absolute bar to this Court granting ECU the relief it seeks." JA106. And while it concluded that the dismissal of MUR No. 7496 was reviewable since it was based purely on legal analysis, the court concluded that it was not "contrary to law." JA112–13.

---

[3] The district court granted New Republican's motion to intervene. JA97.

A panel of this Court affirmed. *See End Citizens United PAC v. FEC*, 90 F.4th 1172 (D.C. Cir. 2024), *reh'g en banc granted, opinion vacated sub nom. End Citizens United PAC v. FEC*, No. 22-5277, 2024 WL 4524248 (D.C. Cir. Oct. 15, 2024). The majority concluded that: (1) "[t]he Commission's dismissal of the first complaint is an unreviewable exercise of its prosecutorial discretion," and; (2) "[w]hile the dismissal of Complaint Two is reviewable, End Citizens United has failed to show the dismissal was contrary to law." *Id.* at 1178–83.

On February 20, 2024, ECU filed a petition for rehearing en banc. This Court vacated the panel's judgment and granted the petition on October 15, 2024.

## SUMMARY OF THE ARGUMENT

An FEC's decision to dismiss a complaint based on prosecutorial discretion is unreviewable. Under black letter law, courts cannot review an agency's decision not to prosecute unless there is some "law to apply" to evaluate that decision. *Overton Park*, 401 U.S. at 413. And while FECA explicitly limits a court's review to determining whether an FEC dismissal is "contrary to law," it does not purport to cabin the FEC's authority to dismiss an enforcement matter for discretionary, non-legal reasons or supply any substantive law that would enable a court to review a decision to dismiss a complaint in an exercise of prosecutorial discretion. FECA thus in no way displaces the strong presumptions that courts cannot review an exercise of discretion not to pursue an enforcement action.

That is true regardless of whether the FEC dismissal is due to a deadlocked vote. While ECU has much to say about the purported evils of Commissioner deadlock, an FEC deadlock is both a natural and intended consequence of Congress's decision to require a bipartisan majority for the Commission to act—a safeguard designed to err on the side of protecting First Amendment rights by ensuring that enforcement actions will proceed only in cases where Commissioners are willing to cross partisan lines. And Congress chose to confine courts to "contrary to law" review *whenever* the Commission dismisses, regardless of how many Commissioners vote in favor of that action. The statute does not authorize more searching review of deadlocked decisions.

Nor does FECA authorize more searching review of decisions that take preliminary legal analysis into consideration when determining whether to exercise enforcement discretion. The strength of a case on the merits is a classic enforcement-discretion consideration, as it informs questions like whether an action will consume significant resources, how long it may take to complete, and whether it might risk setting bad precedent that could harm the agency's broader enforcement priorities. And while courts may be able to make an *ultimate* determination about who is correct on the merits, they are not well-equipped to second-guess an agency's determination that a particular action poses more litigation risk than reward. After all, just because one judge or panel thinks the Commission is right on the merits of

16

a case does not mean the Commission acted "contrary to law" if the Commission felt the case was not worth pursuing due to its initial litigation risk analysis and other discretionary considerations. Once again, the statutory text forecloses judicial review regardless of whether the Commission addresses the merits in the course of (or in the alternative to) exercising its enforcement discretion. To conclude otherwise would not only do violence to the statute that Congress wrote, but would also create separation-of-powers concerns that Congress endeavored to avoid.

Finally, while *Orloski* does not impact the outcome here, it was wrongly decided, and this Court should overrule it. Congress made a conscious choice in FECA to confine judicial review of dismissal decisions to whether they are "contrary to law." *Orloski* subjected those decisions to arbitrary-and-capricious review without considering the statutory text, instead relying on stray statements in earlier decisions that say no such thing. Here, too, this Court should respect the decision Congress made in the text, and hence should remedy *Orloski*'s error.

## ARTICLE III STANDING

ECU lacks Article III standing. FECA's citizen-suit provision does not confer standing on *any* citizen who believes FECA has been violated, or even on any party aggrieved by an FEC dismissal; it "confers a right to sue upon parties who otherwise already have standing." *Common Cause v. FEC*, 108 F.3d 413, 419 (D.C. Cir. 1997) ("*Common Cause I*"). To establish standing, parties must establish the constitutional

requirements of injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). ECU fails to do so.

### A.    ECU Lacks "Informational Standing."

In campaign regulation cases, parties may establish "informational standing" if the FEC's inaction deprives them of information that would inform their ability to vote. *See FEC v. Akins*, 524 U.S. 11, 21 (1998). But "informational standing" exists only when "the information [sought] is not currently known" and "cannot be gleaned from the disclosures that have already been made." *Campaign Legal Center v. FEC*, 31 F.4th 781, 783 (D.C. Cir. 2022). And plaintiffs cannot get around that constraint by alleging that "the information withheld is simply the fact that a violation of FECA has occurred," as that is not a cognizable "informational injury" under Article III. *Common Cause I*, 108 F.3d at 417.

In *Wertheimer v. FEC*, 268 F.3d 1070 (D.C. Cir. 2001), for example, the appellants claimed the FEC's dismissal of their complaint "deprived them of required information about the source and amount of candidates' financing." *Id.* at 1073. "Yet, appellants' counsel did not dispute" that that information was already "reported in some form." *Id.* at 1074. They instead argued only "that the 'fact' of 'coordination' was being withheld." *Id.* at 1075. This Court rejected that as a basis for standing, explaining that "coordination" is not itself a "fact," but rather a "legal conclusion that carries certain law enforcement consequences." *Id.* And a plaintiff

18

cannot "establish injury in fact merely by alleging that he has been deprived of the knowledge as to whether a violation of the law has occurred," as that "would be tantamount to recognizing a justiciable interest in the enforcement of the law." *Id.* at 1074 (quotation omitted); *see also Free Speech for People v. FEC*, 442 F. Supp. 3d 335, 345 (D.D.C. 2020).

Here, as in *Wertheimer*, ECU does not seek any information that is not already available. Instead, it is attempting to compel the FEC to investigate Senator Scott and New Republican to determine whether Senator Scott violated FECA by failing to declare his candidacy earlier. *See* D.C. Dkt. No. 1 ("Compl.") ¶ 2. According to ECU, Senator Scott was required to report expenditures made by New Republican as in-kind contributions. *See* ECU Br. 18–19. But whether ECU is correct about that is irrelevant to any viable theory of information injury, as New Republican *already disclosed* those expenditures. *See* Compl. ¶ 2 ("Rick Scott circumvented FECA's regulation of campaign spending by effectively outsourcing his early campaigning to New Republican PAC."); *id.* ¶¶ 36–37 (discussing amounts New Republican raised in 2017 and 2018, and alleging that "New Republican PAC used its funds to make its first independent expenditure in almost four years to oppose to Bill Nelson, Scott's opponent" and that "nearly all" of its expenditures from May and November 2018 "was spent in support of Scott's campaign"). Indeed, New Republican's

disclosures appear to be what led ECU to believe there were expenditures Senator Scott should have disclosed himself as in-kind contributions. *Id.*

In short, ECU is seeking only a *legal* determination that already-reported information was reported by the wrong party and/or with the wrong classification. That does not suffice to confer informational injury under this Court's precedent. *See Wertheimer*, 268 F.3d at 1074–75. What ECU desires "is for the [Commission] to 'get the bad guys,' rather than disclose information." *Common Cause I*, 108 F.3d at 418. That is not enough to confer Article III standing.

Not only does ECU fail to identify any *factual* information it does not already know; it also fails to allege any downstream injury even from the *legal* information to which it claims entitlement. In *TransUnion*, the Supreme Court held that the plaintiffs lacked Article III standing because they failed to identify "downstream consequences" from failing to receive the information they sought. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (an "asserted informational injury that causes no adverse effects cannot satisfy Article III"). To show a "downstream injury," ECU is "required to identify exactly how its alleged lack of access" to the information it seeks "impeded its programmatic activities." *CREW v. FEC*, 401 F. Supp. 2d 115, 122 (D.D.C. 2005), *aff'd*, 475 F.3d 337 (D.C. Cir. 2007). It has not done so.

ECU does not—and cannot—contend that the FEC's decision not to designate Senator Scott as a candidate in 2017 and require that he disclose New Republican's already-disclosed expenditures would have aided ECU's programmatic activities. ECU may want to vindicate its organization's political positions, but that is nothing more than a "broad interest in having the law enforced" against its political opponents. *Id.* at 118; *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (internal citations omitted) ("a setback to the organization's abstract social interests" cannot confer standing as a downstream injury). For that reason, ECU lacks the kind of informational injury that could confer Article III standing.

## B.     ECU Lacks "Competitor Standing."

ECU's "competitor" injury theory of Article III standing also fails. According to ECU, it is a "political competitor" of the Scott Campaign and New Republican. *See* ECU Br. 19–20. But ECU is not a candidate, so it does not compete with candidates or campaigns for candidacy. *See Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998) ("AmeriPAC cannot claim standing as a 'competitor' of the Clinton campaign because it was never in a position to receive matching funds itself. *Only another candidate could make such a claim*." (emphasis added)).

ECU suggests that New Republican and ECU are competitors because they are both PACs that spend money in the same electoral races. But this argument finds

no support in precedent and would drastically expand this Court's "competitor" standing doctrine. Competitor standing in the political sphere is highly circumscribed, as it already represents a somewhat tenuous extension of the economic standing principle that harm to competition will likely "cause [plaintiff] to lose business." *El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995).

While extending that theory to opposing political *candidates* may make sense, insofar as candidates are "rivals" that engage in a zero-sum contest for one seat with a definitive winner and loser, *see Shays v. FEC*, 414 F.3d 76, 79 (D.C. Cir. 2005), no such relationship exists between ECU and Senator Scott or New Republican. First, ECU did not compete for Senator Scott's seat, nor could it. Second, ECU and New Republican do not compete against each other in an analogous manner; both are entitled to solicit and expend resources, and a finding of liability under FECA for alleged past conduct would not change that landscape or bestow a competitive advantage upon either.[4] Extending competitor standing to PACs based on general ideological opposition would fundamentally distort the doctrine.

It is little surprise, then, that ECU cannot identify any precedent for its theory that it has standing based on purported competition with another PAC with a

---

[4] For the 2017–2018 cycle, there is no FEC public report of an independent expenditure by ECU opposing Senator Scott or supporting then-incumbent Senator Nelson. *See End Citizens United*, FEC, https://www.fec.gov/data/committee/C00573261/?cycle=2018 (last accessed Dec. 24, 2024).

different political position. ECU invokes *Shays* (*see* ECU Br. 19), but that case involved sitting members of Congress. 414 F.3d at 79. As this Court explained in *Nader v. FEC*, 725 F.3d 226 (D.C. Cir. 2013), competitor standing requires an "ongoing campaign" for which the respondent's alleged misconduct gives it an advantage over the petitioner. This Court distinguished *Shays* because, in *Nader*, the campaign had already "run its course." *Id.* at 228–29; *see also Hassan v. FEC*, 893 F. Supp. 2d 248, 254 n.6 (D.D.C. 2012) ("[A] candidate—*as opposed to individual voters and political action groups*—would theoretically have standing based upon a 'competitive injury.'" (emphasis added)). *A fortiori*, *Shays* does not support ECU here, where the parties never participated in a campaign against each other.

At bottom, ECU has not experienced any "injury to [its] interest in effectively voicing [its] political message." *Nat. L. Party v. FEC*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000). ECU may still engage in all activities permitted for PACs under FECA, no matter what the FEC does vis-à-vis New Republican and Senator Scott. ECU has suffered no lost opportunity, nor has it been excluded from the political process in any way. Thus, ECU has failed to allege a cognizable Article III injury.

### C.    ECU Has Not Established That Any Injury It Suffered Could Be Redressed by These Proceedings.

Even if ECU had alleged an Article III injury, it fails to satisfy the redressability prong for the same reasons this Court identified in *CREW v. FEC*, 475 F.3d 337, 340 (D.C. Cir. 2007). There, CREW filed an administrative complaint

23

alleging that Grover Norquist provided the Bush-Cheney 2004 campaign with a list of conservative activists, that the list constituted an in-kind contribution exceeding Norquist's legal contribution limit, and that the Bush-Cheney 2004 campaign failed to report the in-kind contribution. *Id.* at 338. CREW argued that it suffered injury "because if it knew the actual value of the list, it could better inform the public of the relationship between Norquist and the Bush Administration." *Id.* at 339. The FEC dismissed the complaint. *Id.*

CREW sought judicial review, but this Court dismissed for lack of standing. *Id.* at 341. As it explained, any injury CREW may have suffered failed the "redressability" test because even if "the Commission finds 'probable cause' to believe that someone has violated the Act, it must attempt to negotiate a conciliation agreement," and "[n]othing in the Act requires that disclosure of information be part of such an agreement." *Id.* at 340. And even if the FEC decided to pursue an action in federal court should negotiations fail, there "is no requirement that the Commission seek, or that a court grant, a particular form of redress in such an action." *Id.*; *see also FEC v. Rose,* 806 F.2d 1081, 1091 (D.C. Cir. 1986); *cf. N.Y. State Dep't of L. v. FCC*, 984 F.2d 1209, 1214 (D.C. Cir. 1993) (upholding agency's decision to settle "an enforcement action without resolving any of the legal issues raised in the Order to Show Cause initiating that action").

Here, too, even assuming ECU suffered an Article III injury traceable to the information it seeks from an investigation and enforcement action, the declaration it seeks would not remedy that injury. ECU's efforts to force an executive agency to investigate third parties is instead a classic non-justiciable "interest in the enforcement of the law." *Common Cause I*, 108 F.3d at 418; *CREW*, 401 F. Supp. 2d at 122 ("It is axiomatic that standing cannot rest on a plaintiff's alleged interest in having the law enforced."). The Supreme Court "has long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" *Texas*, 599 U.S. at 674 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). For that reason, too, the Court should dismiss for lack of standing.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*. *ACLU v. U.S. DOJ*, 655 F.3d 1, 5 (D.C. Cir. 2011). Because ECU petitions from the FEC's dismissal of an administrative complaint, the courts' role is only to determine if that dismissal was "contrary to law." 52 U.S.C. § 30109(a)(8)(C).

## ARGUMENT

**I.     FECA Does Not Empower Courts to Review an FEC Determination to Exercise Its Prosecutorial Discretion to Dismiss a Complaint.**

**A.     An FEC Exercise of Prosecutorial Discretion Cannot Be "Contrary to Law" Under FECA.**

As the Supreme Court explained in *Chaney*, "an agency's decision not to prosecute or enforce" is the quintessential decision unsuitable for judicial review. 470 U.S. at 831. "The reasons for this general unsuitability are many," including the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as resource constraints and enforcement priorities. *Id.* When an agency refuses to prosecute, moreover, it "does not exercise its *coercive* power" and "does not infringe upon areas [of law] that courts often are called upon to protect." *Id.* at 832. An agency's decision not to pursue an enforcement action based on prosecutorial discretion is therefore subject to a strong presumption of non-reviewability.

To be sure, Congress can override that presumption. *Id.* at 832–33. But to do so, Congress must cabin an agency's enforcement discretion by (1) setting the agency's "substantive [enforcement] priorities," or (2) "circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.*; *see also Lincoln*, 508 U.S. at 193; *Drake v. FAA*, 291 F.3d 59, 71 (D.C. Cir. 2002). After all, discretionary agency decisions cannot be subject to judicial review if there is "no

law to apply" or "meaningful legal standard" to guide a court's review. *Overton Park*, 401 U.S. at 411–14; *see also, e.g.*, *Schieber*, 77 F.4th at 813. As the Supreme Court explained in *Overton Park*, because a court needs "clear and specific directives" to determine the boundaries of agency discretion, a court can evaluate an agency's exercise of discretion only if the governing statute provides concrete guidelines against which it can measure the agency's action. 401 U.S. at 411 (reviewing agency decision where governing statute included "a plain and explicit bar" on certain actions). Without those directives, an exercise of prosecutorial discretion is unreviewable. *Id.* at 410–11.

FECA does not rebut the strong presumption that the FEC's exercise of its enforcement discretion is not subject to judicial review. The statute only authorizes courts to review whether an FEC dismissal of a complaint is "contrary to law." 52 U.S.C. § 30109(a)(8)(C). But FECA does not constrain the FEC's discretion to dismiss a complaint for *non-legal* reasons, let alone empower courts to review such discretionary determinations. FECA does not dictate the FEC's enforcement priorities, limit its power to choose among cases, guide its resource allocation, or otherwise cabin its enforcement discretion in any way. Instead, FECA grants the FEC unfettered authority to "vote to dismiss" an administrative complaint at any time, including before an investigation begins. *See* 52 U.S.C. § 30109(a)(1)–(8); *Campaign Legal Ctr. v. 45Committee, Inc.*, 118 F.4th 378, 382 (D.C. Cir. 2024)

("Rather than initiate an investigation, the Commission at any time can dismiss a complaint."). And FECA says nothing about what discretionary factors the FEC may consider when determining whether to dismiss complaints—including when cases are initiated by third-party complaints.

This Court was thus correct in both *Commission on Hope* and *New Models* to conclude that an FEC decision to dismiss an administrative complaint based on prosecutorial discretion—*i.e.*, non-legal considerations—is unreviewable, as FECA simply does not provide any guidance as to how a court would go about trying to conduct that inquiry. Indeed, ECU does not and cannot identify *any* law (much less any "meaningful legal standard" or "clear and specific directives") that a court could apply to evaluate the FEC's exercise of prosecutorial discretion to dismiss. *See Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1481 (D.C. Cir. 1995); *see also Coker v. Sullivan*, 902 F.2d 84, 88 (D.C. Cir. 1990) ("The Social Security Act provides no reviewable standards circumscribing HHS' enforcement discretion over the EA component of the AFDC program.").

Take this case. The Controlling Commissioners explained that they declined to investigate because of resource constraints and a backlog of cases, and because it would be "[un]wise" to proceed when doing so would entail a "wide-ranging, costly, and invasive investigation." JA282–90. ECU has never even tried to explain how a court could evaluate the propriety of those reasons, let alone identified any provision

28

of FECA that says any of those considerations is an "improper legal ground[]" for dismissal. *Akins*, 524 U.S. at 25.

This Court has dismissed similar lawsuits where third parties challenged an agency's prosecutorial discretion not to act. In *Secretary of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157 (D.C. Cir. 2006), for example, the Court held that a statute similar to FECA did not overcome the *Chaney* presumption because it left the agency's charging discretion "uncabined." The Mine Act provided that "[i]f, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, . . . he shall, with reasonable promptness, issue a citation to the operator." *Id.* This Court held that, despite the mandatory "shall," the Secretary's exercise of prosecutorial discretion was unreviewable because the Mine Act did not place any substantive constraints on his exercise of discretion. *Id.*; *see also Balt. Gas & Elec. Co. v. FERC*, 252 F.3d 456, 461 (D.C. Cir. 2001) (*Chaney* presumption not overcome where statutes "are utterly silent on the manner in which the Commission is to proceed against a particular transgressor"). Here, too, ECU's inability to identify anything in FECA that substantively constrains the FEC's discretion is fatal to its argument. *See Chaney*, 470 U.S. at 832–33; *Drake*, 291 F.3d at 71; *Shoshone-Bannock Tribes*, 56 F.3d at 1481 ("The Tribes identify no statute or other restriction so limiting the Attorney General's discretion here. The provision conferring

29

authority on the Attorney General to represent tribal interests contains no 'meaningful standard' limiting her prosecutorial discretion.").

ECU insists that "FECA's statutory language is clear and undeniably evinces Congress's intent to make dismissal decisions reviewable." ECU Br. 23. But Congress did not grant courts plenary power to review "dismissal decisions." It granted courts a narrowly circumscribed power to review dismissal decisions *only* for whether they are "contrary to law." 52 U.S.C. § 30109(a)(8)(C).

If anything, the existence of that limited judicial-review provision undermines ECU's argument that courts may review exercises of enforcement discretion. Congress enacted and has amended FECA against "the backdrop of existing law" holding that an agency's exercise of prosecutorial discretion is unreviewable. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013)). Congress could have constrained the FEC's ability to invoke prosecutorial discretion to dismiss cases, and expressly authorized courts to review such exercises for compliance with those constraints, but it chose to do neither of those things. Congress instead authorized review only of the narrow question whether a dismissal contravenes some *law—i.e.*, some statute or regulation that carries the "force and effect of law." *United States v. Mitchell*, 39 F.3d 465, 476 (4th Cir. 1994). And it created no meaningful legal standard that *could* constrain the Commission's enforcement discretion or guide a

court's effort to review its exercise. *See Overton Park*, 401 U.S. at 411–14. Reading FECA to empower Article III courts to second-guess the FEC's non-legal reasons (*e.g.*, resource constraints, etc.) for declining to pursue a complaint thus would flout both the plain language of the statute and Congress's evident intent.

ECU insists that Congress *did* constrain the FEC's discretion because it authorized the filing of a petition for judicial review when the FEC fails to act on a complaint within 120 days, *see* 52 U.S.C. § 30109(a)(8)(A)–(C). *See* ECU Br. 24–25. But there is a fundamental difference between limiting how long an agency may take to make a decision and limiting the factors an agency may consider when making that decision. And while Congress may have decided that courts could review an FEC failure to act after 120 days, Congress made plain that courts may review a failure to act *only* for whether it is "contrary to law," 52 U.S.C. § 30109(a)(8)(C)—an inquiry guided by the long-standing "*TRAC*-factors" for assessing whether an agency's delay in reaching a decision is unreasonable. *See TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984). The *TRAC*-factors, of course, have nothing to say when the agency *has* made an affirmative decision not to prosecute, which is likely why not even ECU suggests that courts should review an FEC decision *not* to proceed under those factors. And even if a court finds that a failure to act was unreasonable under those factors, it cannot order the FEC to pursue an enforcement action; it may order the FEC only "to conform with [its] declaration"

that the failure to act was contrary to law, 52 U.S.C. § 30109(a)(8)(C)—*i.e.*, to timely act. That is about as far as it gets from a clear, substantive constraint on an agency's enforcement discretion.

With no support in the statute, ECU argues that the Supreme Court already held in *Akins* that *all* FEC non-enforcement decisions are reviewable. *See, e.g.*, ECU Br. 16. But ECU is wrong. *Akins* addressed only whether voters have Article III standing to challenge a decision not to bring an enforcement action; it did not address the scope of judicial review when voters bring such an action. *See Akins*, 524 U.S. at 18, 21. To be sure, *Akins* noted that FECA "explicitly indicates" that FEC dismissals are subject to *some* judicial review. *Id.* at 26. But the Court in no way suggested that courts may review dismissals that are grounded in enforcement discretion rather than legal conclusions. To the contrary, the Court observed that "those adversely affected by a discretionary agency decision generally have standing to complain *that the agency based its decision upon an improper legal ground*." *Id.* at 25 (emphasis added). And the Court had no occasion to consider whether enforcement decisions may be reviewed when they are *not* based on legal grounds because the FEC's dismissal there *was* premised on purely legal grounds: the Commissioners voted to dismiss based on their interpretation of the term "political committee" in FECA. *Id.* at 18; *see also id.* at 25 ("[W]e cannot know that the FEC would have exercised its prosecutorial discretion in this way."). *Akins* thus lends no

32

support to ECU's argument that courts may review agency decisions not to prosecute based on *non-legal* grounds.

*Common Cause v. FEC* is also unavailing for ECU. 489 F. Supp. 738, 744 (D.D.C. 1980) ("*Common Cause II*") (cited ECU Br. 25). The court there did not review a decision to dismiss a complaint based on prosecutorial discretion. Rather, it determined whether the FEC abused its discretion by failing to act *at all* within 90 days, which was the trigger for judicial review at the time. The court answered that question by focusing on whether the "exceedingly slow pace" at which the agency moved was reasonable under the circumstances of that case. *Id.* The court did not assess the propriety of an exercise of discretion that the agency had not yet taken, and the court specifically noted that "the failure to act provision . . . '[is] *not* intended to work a transfer of prosecutorial discretion from the Commission to the courts.'" *Id.* at 743–44 (emphasis added) (quoting 125 Cong. Rec. S19099 (daily ed. Dec. 18, 1979) (statement of Sen. Pell)). *Common Cause II* thus reinforces the fundamental difference between cabining how long an agency may take to make a decision and cabining what it may consider in making that decision.

In short, nothing in the statutory text or cases interpreting it provides any basis for concluding that FECA overrides *Chaney*'s strong presumption against judicial review of an agency's exercise of its enforcement discretion.

**B.    An FEC Exercise of Prosecutorial Discretion Does Not Become Reviewable Just Because the Commissioners Deadlocked or Considered the Merits.**

When the Commissioners invoke prosecutorial discretion to dismiss an enforcement case, the dismissal is not reviewable—full stop. ECU suggests that a decision may be reviewed if the dismissal arose from a deadlock vote, or if the Controlling Commissioners conducted some legal analysis in the course of invoking prosecutorial discretion. Both arguments lack merit.

### 1.    FECA does not differentiate between deadlock and majority-vote dismissals.

Contrary to ECU's contentions (*see*, *e.g.*, ECU Br. 1), the scope of judicial review under FECA is the same regardless of whether the Commission declines to investigate because of a three-to-three deadlock vote or a majority vote: either way, courts may determine only whether a dismissal was "contrary to law." 52 U.S.C. § 30109(a)(8)(C). As Judge Griffith has explained, FECA "does not instruct how to differentiate between a deadlock vote that prompts a dismissal and a vote by four or more Commissioners to dismiss the action outright;" it is instead entirely "silen[t] on deadlocks." *Commission on Hope II*, 923 F.3d at 1142 (Griffith, J., concurring in the denial of rehearing en banc). That silence suffices to defeat ECU's effort to read into the statute some special form of judicial review when the FEC deadlocks.

ECU resists that conclusion, pointing to various snippets from the Act's legislative history in which Members of Congress discussed the importance of

enforcing the law without partisan interference. *See* ECU Br. 49. Of course, "legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). Congressional intent is manifest in the plain text, which cannot be overridden by general suppositions about intent. *See Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 171 (2007) ("[A] statute's remedial purpose cannot compensate for the lack of a statutory basis."); *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211–12 (1998) (Congress's extratextual expectations or subjective intent are "irrelevant" in the "context of an unambiguous statutory text").

But that aside, as ECU acknowledges, deadlocks are a "predictable" and intended consequence of the FEC's "careful bipartisan structure." ECU Br. 1, 17. Congress could have created an agency with an odd number of commissioners, thereby precluding deadlocks most of the time. Congress could have given the FEC chairperson authority to break a deadlock, or required investigation upon the General Counsel's recommendation, or provided that deadlock votes require agency *action* rather than *inaction*, as it has done for the six-person International Trade Commission ("ITC"). *See* 19 U.S.C. § 1330(d)(5) (if "one-half of the number of commissioners voting agree that [an] investigation should be made, such investigation shall thereupon be carried out in accordance with the statutory authority covering the matter in question"). Or it could have expressly authorized

additional judicial review when the Commission dismisses a complaint because of a deadlocked vote.

Congress did none of those things. Instead, in recognition of the strong First Amendment interests at stake, Congress made the conscious choice both to make the FEC an even-numbered bipartisan commission and to require dismissal of an administrative complaint absent four votes to enforce. In doing so, Congress ensured that highly sensitive investigations into constitutionally protected speech would not proceed without bipartisan support. That careful balance, not judicial intrusion into Article II enforcement discretion, is how Congress chose to guard against partisan abuse. ECU may disagree with that choice, but that does not empower this Court to override the statute Congress wrote.

2.    **A decision to dismiss based on prosecutorial discretion does not become reviewable just because it contains some legal analysis.**

ECU argues that courts may review a dismissal decision based on prosecutorial discretion if it also contains some legal analysis. *See* ECU Br. 16, 23–24. Once again, that argument is refuted by the plain text of the statute.

Courts may review a dismissal decision *only* for whether it is "contrary to law." 52 U.S.C. § 30109(a)(8)(C). To be sure, a dismissal may be "contrary to law" if the FEC mistakenly concludes that it lacks the *power* to pursue it. But the Commission does not and cannot act "contrary to law" simply by assessing the

strength of its case on the merits and factoring that into its assessment of whether to exercise its enforcement discretion. After all, an agency can *and should* take into account "whether [it] is likely to succeed" on the merits, as that informs classic enforcement discretion considerations like what volume of resources an action is likely to exhaust, whether pursuing it is likely to advance the agency's broader enforcement priorities, and whether there is a real risk of creating bad precedent. *Chaney*, 470 U.S. at 831. And an agency may be well served by not pursuing a case even when it thinks the law is on its side, as a litigant has to consider not only existing precedent, but the various fora in which it may be forced to defend itself. For example, an agency may make the reasonable decision not to pursue a case that it has a strong chance of winning under circuit precedent if it thinks there is a serious risk of en banc or Supreme Court review. And while courts may be well-equipped to decide the *ultimate* merits of a case, they are not well-equipped to decide whether an agency gave too much or too little weight to those kinds of risks. *See Wayte v. United States*, 470 U.S. 598, 607 (1985) (identifying "the strength of the case" as a factor "not readily susceptible to the kind of analysis the courts are competent to undertake")

To the extent ECU suggests that courts should review whether the Commission's claim to have exercised enforcement discretion is genuine, that argument fares even worse. FEC Commissioners—like other executive officials—

37

are entitled to a strong presumption of good faith. *See, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 464 (noting that, because the power to prosecute is a "'special province' of the Executive," "'[t]he presumption of regularity supports' their prosecutorial decisions and . . . 'courts presume that they have properly discharged their official duties'" (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926))); *Comcast Corp. v. FCC*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008) ("We must presume an agency acts in good faith."); *Friedman v. FAA*, 841 F.3d 537, 541 n.1 (D.C. Cir. 2016) (same). As this Court has "so often said," when there is "no indication that the [agency] will act cavalierly or in bad faith,' its assertions . . . should be accepted at face value." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1090 (D.C. Cir. 1992) (quoting *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 975 (D.C. Cir. 1980)). That presumption of course applies to FEC Commissioners. *See, e.g.*, *FEC v. Nat'l Rifle Ass'n*, 553 F. Supp. 1331 (D.D.C. 1983). And ECU has not alleged or even suggested bad faith on the part of the Controlling Commissioners here—it simply disagrees with their votes.[5]

Because the Court cannot disregard or disbelieve the Controlling Commissioners' explanations, it cannot skip past their invocation and explanation

---

[5] ECU also tellingly does not quote or even mention the *full* Statement of Reasons for dismissal. It selectively quotes material from only the final page of the eleven-page document, JA281–91, reducing the Controlling Commissioners' analysis to just one line—that they "exercised [their] prosecutorial discretion." ECU Br. 14.

of prosecutorial discretion to address their legal analysis. Once the Controlling

Commissioners assert that they voted to dismiss because of prosecutorial discretion,

that explanation must be "accepted at face value," *Invention Submission*, 965 F.2d

at 1090, so there is no basis to parse the legal analysis that may have impacted it.

*See Commission on Hope I*, 892 F.3d at 442 (quoting *Crowley Caribbean Transp.,

Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994)) ("The law of this circuit 'rejects the

notion of carving reviewable legal rulings out from the middle of non-reviewable

actions.'"). To do so, a court would have to ignore the actual reason for dismissal—

prosecutorial discretion—and treat the legal statements of the Controlling

Commissioners as if they alone "were expressing the Commission's rationale." *Id.*

at 437.

That would be troubling enough in the context of a Statement of Reasons

issued by a majority of the Commission. But it is particularly troubling in the context

of statements issued by controlling commissioners in a deadlock situation—

especially when it is only this Court's precedent, not anything in FECA itself, that

compels them to provide that explanation. *DCCC*, 831 F.2d at 1131–32. Treating a

Statement of Reasons issued by controlling commissioners as if it spoke for the

Commission is a "rather apparent fiction raising problems of its own" even when it

does *not* involve ignoring prosecutorial discretion—the three Commissioners, for

example, could "each express[] a different reason for voting against enforcement

proceedings." *Commission on Hope I*, 892 F.3d at 438 & n.4. It would be even more untenable for a court to bypass the determinative non-legal reasons for dismissal offered and ascribe to the Commission legal reasoning that not even the Controlling Commissioners embraced.

In all events, even if there were a basis to parse a Statement of Reasons to reach legal analysis in *some* case, to do so here would produce an impermissible advisory opinion. The Controlling Commissioners already said that they would vote not to act on the complaint based on prosecutorial discretion wholly apart from their legal concerns. *See Akins*, 524 U.S. at 24 (noting that an agency might, "in the exercise of its lawful discretion, reach the same result for a different reason" even if a court determines that it misinterpreted the law and remands the case); *End Citizens United PAC*, 90 F.4th at 1178 (explaining that this possibility is why dismissals are only reviewable if they rest "*solely*" on legal interpretation). An opinion reviewing their legal analysis would therefore not affect the legal rights of any of the litigants, which transgresses Article III. *See Chamber of Com. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) ("[F]ederal courts are without authority 'to render advisory opinions [or] 'to decide questions that cannot affect the rights of litigants in the case before them.'" (quoting *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975)).

**II.    ECU's Policy Arguments Are at Odds with Congress's Judgments in FECA's Carefully Crafted Enforcement Scheme.**

With text and precedent stacked against it, ECU devotes much of its brief to arguments about what *it* thinks Congress was trying to accomplish in FEC. Of course, courts cannot "rewrite a statute's plain text to correspond to its supposed purposes." *Landstar Express Am., Inc. v. FMC*, 569 F.3d 493, 498 (D.C. Cir. 2009); *see also Norfolk S. Ry.*, 549 U.S. at 171 ("[A] statute's remedial purpose cannot compensate for the lack of a statutory basis."); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) ("We will not alter the text in order to satisfy the policy preferences of the Commissioner."). But in all events, ECU's purposive arguments reflect ECU's policy preferences, not Congress's.

As its name suggests, "End Citizens United" is unsatisfied with the level of campaign-finance enforcement in this country and believes more aggressive enforcement would improve "democracy." ECU Br. 1, 30. ECU tries to ascribe the same motivation to Congress, insisting that Congress, above all things, wanted FECA to be "robustly" enforced without "partisan reluctance" to act. ECU Br. 3, 30–31. But "no legislation pursues its purposes at all costs." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012) (internal quotation omitted). And ECU's claims that Congress was myopically focused on "robust" enforcement are impossible to reconcile with how FECA works.

41

If anything, FECA is unusual in that it makes it particularly *difficult* for the Commission to act since all action requires a four-vote majority of a Commission divided evenly on partisan lines. Far from evincing a strong preference for "robust" enforcement, that structure evinces Congress's desire to ensure that the Commission will pursue only the most obvious and egregious violations of the campaign finance laws that a bipartisan majority of Commissioners support. ECU may not like that this structure makes deadlock inevitable and makes it harder for the Commission to act when some or all of its members are unwilling to cross partisan lines. But from Congress's perspective, that is a feature of the scheme, not a bug: In recognition of the strong First Amendment interests at stake, and the reality that there will *always* be partisan interests at play when it comes to campaigns for elected office, Congress wanted to ensure that the FEC would have "to clear a series of bipartisan vetogates before commencing an enforcement action." *New Models II*, 55 F.4th at 920. That is why this Court recognized even before the *CREW* cases that "[t]o ignore this [four-vote] requirement would be to undermine the carefully balanced bipartisan structure which Congress has erected." *Common Cause v. FEC*, 842 F.2d 436, 449 n.32 (D.C. Cir. 1988).

ECU tries to infer a different purpose from the existence of the citizen-suit provision. But Congress did not allow citizen suits to go forward under any and all circumstances; it allowed them to go forward only when the FEC fails to "conform"

42

with a judicial declaration that it acted "contrary to law." 52 U.S.C. § 30109(a)(8)(C). As Senator Pell explained during the floor debate over the 1979 amendments that led to the citizen-suit provision, FECA "provides that an order dismissing a complaint is reviewable in court *solely to assure that the Commission's action is not based on an error of law*"; beyond that, "the Commission is entrusted with the responsibility of passing on complaints." 125 Cong. Rec. 36,754 (Dec. 18, 1979) (statement of Sen. Pell) (emphasis added). He went on to say that the "limited bases for judicial intervention are not intended to work a transfer of prosecutorial discretion from the Commission to the courts." *Id.* Accordingly, "if the Commission considers a case and is evenly divided as to whether to proceed, that division which under the act precludes Commission action on the merits is not subject to review any more than a similar prosecutorial decision by a U.S. attorney." *Id.* In earlier debates, another Member of Congress noted that the FEC's enforcement process was designed to mitigate fear that the Commission would turn into "a bunch of headhunters." 120 Cong. Rec. 27,473 (Aug. 8, 1974) (remarks of Rep. Mathis).

Although, as this Court has noted, "Congress votes only on the statutory words, and not on statements made in committee reports or on the House or Senate floor," *DCCC*, 831 F.2d at 1134, these statements thoroughly refute ECU's claim that Congress was myopically focused only on "robust" enforcement.

ECU's contrary arguments also ignore how citizen suits themselves heighten the risk of politicized enforcement, as the third-party special interest groups that bring them—many of which are overtly partisan—may be motivated to harass, intimidate, and silence political opponents. For example, in 1999, a study of approximately eighty FEC matters under review revealed that a heavy proportion—sixty-three percent—were initiated by outside parties. *See* Todd Lochner & Bruce E. Cain, *Equity and Efficacy in the Enforcement of Campaign Finance Laws*, 77 TEX. L. REV. 1891, 1910, 1927 (1999). And while most of those were dismissed, these filings forced the FEC to spend the bulk of its resources "pursuing relatively technical or trivial violations," *id.* at 1897, many of which undoubtedly were brought just to harass political opponents. For this reason, some experts have urged courts to reject "recommendations that the Commission's decisions shall be given no deference by the courts" when complainants challenge dismissals, as "[t]hese procedures would probably result in a greater number of frivolous complaints" and "increase the incentives for groups to bring nuisance lawsuits against their political rivals." Bradley A. Smith & Stephen M. Hoersting, *A Toothless Anaconda: Innovation, Impotence and Overenforcement at the Federal Election Commission*, 1 ELECTION L.J. 145, 154 (2002).

ECU's own arguments prove the point. Citing evidence (presented by CREW) about FEC deadlocks "in dozens of complaints filed against President-Elect Trump"

since 2018, ECU claims that "the *CREW* cases have opened the door for partisan abuse." ECU Br. 36 (citing CREW *Amicus* Br. 6–9). But while ECU assumes that "partisanship was a factor" in those *dismissals*, it ignores the possibility that partisanship was a factor in the *filing* of the complaints, and/or that many were simply meritless. ECU cannot claim "partisan abuse" just because a majority of the FEC did not share its views about the merits of complaints a particular candidate it apparently does not like. The fact that ECU's primary complaint is that the FEC is dismissing too many complaints filed against ECU's political opponents instead just underscores the danger that Congress was trying to avoid.[6]

Congress understood all of this, and it consciously structured FECA to guard against exactly that kind of partisan gamesmanship. As former FEC Chairman Bradley Smith has explained, "the existing bipartisan setup ensures that *neither* party can use the agency as a weapon to punish political opponents." Bradley Smith, *FEC Shows How (and Why) Bipartisanship Can Still Work*, THE HILL (Feb. 16, 2024), https://thehill.com/opinion/4471945-fec-shows-how-and-why-bipartisanship-can-still-work/ (emphasis added). While "[i]t is true that the FEC bipartisan structure will lead it to tie votes at times," that structure "intentionally ensures that bipartisan

---

[6] ECU's analysis, moreover, ignores the total number of complaints investigated and prosecuted vis-à-vis the agency's limited resources and backlog. In other words, ECU does not claim that the total number of complaints acted upon is unreasonably low compared to the resources available; it just takes issue with which complaints the FEC chose to pursue.

consensus is a prerequisite for determining whether a violation occurred, or for adopting regulations that can affect our vital free speech rights." *Id.* "In this era of 'lawfare,'" Smith explained, "it is hard to imagine an agency required to regulate political campaigns would have any legitimacy without this bipartisan structure." *Id.* Without it, campaign finance laws would be converted into a tool for partisan interest groups to harass their political opponents—and a grave threat to core First Amendment rights.

And it is not just First Amendment concerns Congress had to navigate. Empowering Article III courts to exercise plenary review over FEC decisions to dismiss third-party complaints based on prosecutorial discretion would raise serious separation-of-powers concerns, as that would encroach on the Executive's duty to "take Care that the Laws be faithfully executed." U.S. CONST., art. II, § 3. And the constitutional concerns are particularly acute here because, if ECU had its way, Article III courts would have to sit as executive supervisors making decisions about when third parties could bring their *own* coercive actions against other citizens for engaging in First Amendment activity, effecting a complete shift of enforcement power away from agencies and to Article III courts and private litigants in a doubly fraught constitutional context. Some Justices have questioned the validity of citizen-suit provisions for exactly those reasons. *DOT v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("[I]t raises '[d]ifficult and fundamental questions'

46

about 'the delegation of Executive power' when Congress authorizes citizen suits." (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring))).

In short, ECU's real gripe is not with the *CREW* cases, but with how Congress designed the FEC. While ECU maligns deadlock as "a judicial-review kill switch" that "undermine[s] the FEC's bipartisan balance" and "nullif[ies] all FECA enforcement" by "allow[ing] any partisan block of the FEC to become a law unto itself," Congress viewed deadlock as critical safeguard *against* the agency becoming a tool for partisan gain. ECU Br. 3, 32–34, 39. What ECU describes is not a flaw in the system; it is exactly what Congress intended.[7] And the very partisan concerns ECU trumpets explain why Congress did not anoint the courts tiebreakers when the FEC deadlocks; it instead carefully circumscribed their role to the kind of *legal* review to which they are suited. ECU may not like Congress's decision, but that is an issue to take up with Congress. This Court should not use judicial review as a workaround to restructure the FEC in a manner that "Congress could obviously

---

[7] ECU also ignores the availability of contrary-to-law review when the Controlling Commissioners rely solely on legal interpretation, which has happened many times over the past several years. Indeed, in this very case, the FEC dismissed the second complaint based solely on legal grounds. *See End Citizens United PAC*, 90 F.4th at 1181.

choose, if it sought to do so." *FEC v. Nat'l Rifle Ass'n Pol. Victory Fund*, 513 U.S. 88, 96 (1994).

## III.    *Orloski*'s Authorization of Arbitrary-and-Capricious Review Conflicts with the Plain Text of FECA and Has No Basis in Precedent.

In *Orloski*, this Court held that an FEC decision can be "contrary to law" under 52 U.S.C. § 30109(a)(8)(C) "if the FEC's dismissal of the complaint . . . was arbitrary or capricious, or an abuse of discretion." 795 F.2d at 161. *Orloski* was wrongly decided, and this Court should overrule it. The decision has no grounding in FECA or precedent, and it directly contravenes FECA's text. In all events, *Orloski* would not help ECU here, as the Commission plainly did not abuse its enforcement discretion by invoking it.

### A.    FECA's "Contrary to Law" Standard Does Not Encompass Arbitrary-and-Capricious Review or Abuse-of-Discretion Review.

As this Court has repeatedly recognized, contrary-to-law and abuse-of-discretion are "different forms of review." *End Citizens United PAC*, 90 F.4th at 1177 n.3; *see also Scheduled Airlines Traffic Offs., Inc. v. DOD*, 87 F.3d 1356, 1361 (D.C. Cir. 1996); *Mil. Toxics Project v. EPA*, 146 F.3d 948, 954–56 (D.C. Cir. 1998). Assessing whether agency action is contrary to law requires a court to analyze the relevant statute or regulation and determine whether the agency violated it. *See, e.g.*, *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 304 (2003); *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002). By contrast, arbitrary-and-

capricious and abuse-of-discretion review require courts to assess whether an agency that has been afforded some measure of discretion examined the relevant data and articulated a satisfactory explanation for its decision. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). That is why Congress expressly distinguished between these forms of review in the Administrative Procedure Act ("APA"), which provides that courts may set aside agency action that is "arbitrary, capricious, an abuse of discretion, *or* otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added).

Had Congress wanted to subject FEC dismissals to arbitrary-and-capricious and abuse-of-discretion review, it could have said so, as it did in the APA. Instead, Congress provided that courts may review dismissal decisions *only* for whether they are "contrary to law." 52 U.S.C. § 30109(a)(8)(C). Courts must presume that "a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). And Congress subjected dismissal decisions only to contrary-to-law review.

Not only does that stand in stark contrast to the APA; it stands in stark contrast to other parts of FECA. While FECA expressly limits judicial review of agency *inaction* to whether it was "contrary to law," it imposes no such limits on judicial review of adverse determinations, such as fines, penalties, or other significant regulatory actions, made pursuant to coercive *action* by the FEC. *See* 52 U.S.C.

§ 30109(a)(4)(C)(iii) (allowing anyone subject to an adverse determination in an FEC enforcement action to "obtain a review of such determination" in federal court). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation omitted). There is thus every reason to presume that Congress deliberately limited judicial review to only "contrary to law" review for FEC decisions *not* to enforce.

While the text speaks for itself, shielding dismissal decisions but not enforcement decisions from full APA review makes eminent sense. Coercive actions have far-reaching consequences that warrant robust procedural protections, including more fulsome judicial review. But when a third party initiates a complaint and sues based on its dismissal, concerns about partisan abuse of campaign finance laws to harass political opponents, not agency overreach, are at their apex. That is why Congress "wisely provided that the Commission's dismissal of a complaint should be reversed *only* if 'contrary to law,'" *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37 (1981) ("*DSCC*") (emphasis added), rather than empowering courts to second-guess whether the Commission should pursue third-party complaints in the highly sensitive context of challenging First Amendment activity under arbitrary-and-capriciousness and/or abuse-of-discretion review.

### B. *Orloski* Did Not Purport to Interpret FECA's Citizen-Suit Provision and Is Not Grounded in Precedent.

In concluding otherwise, *Orloski* did not focus on FECA's text. The Court instead relied entirely on stray statements from two cases—*DSCC*, 454 U.S. at 31, 37, and *In re Carter-Mondale Reelection Committee, Inc.*, 642 F.2d 538, 542 (D.C. Cir. 1980). But neither case supports the proposition that "contrary to law" review encompasses arbitrary-and-capricious or abuse-of-discretion review.

In *DSCC*, the Supreme Court addressed whether "[FECA] is violated when a state committee of a political party designates the national senatorial committee of that party as its agent for the purpose of making expenditures allowed by the Act." 454 U.S. at 29. There, the National Republican Senatorial Committee acted as the agent of national and state parties to make expenditures on their behalf. *Id.* The DSCC filed an administrative complaint challenging that conduct, which the FEC unanimously dismissed on the ground that the conduct complied with its interpretation of FECA and its regulations. *Id.* at 30. The district court dismissed the DSCC's subsequent petition, but this Court reversed.

The Supreme Court granted certiorari and reversed. But in doing so, the Court answered only the legal question whether the FEC's dismissal was "contrary to law," concluding it was not. According to the Court, that "task" involved only a "narrow[] inquiry into whether the Commission's construction" of the statutory text "was 'sufficiently reasonable.'" *Id.* at 39. The Court did not engage in any independent

51

examination of whether the agency's actions were arbitrary, capricious, or an abuse of discretion. The Court mentioned those standards only once, when quoting the district court's order holding that the FEC's decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 31. And far from sanctioning or inviting arbitrary-and-capricious or abuse-of-discretion review, *DSCC* explicitly noted that "Congress wisely provided that the Commission's dismissal of a complaint should be reversed *only if* 'contrary to law.'" *Id.* at 37. *DSCC* confirms that *Orloski* was wrong.

As for *In re Carter-Mondale Reelection Committee*, this Court did not even interpret FECA's citizen-suit provision, let alone hold that the "contrary to law" review encompasses arbitrary-and-capricious or abuse-of-discretion review. 642 F.2d 538. There, a third-party had filed a complaint asking the FEC not to certify the Republican candidates for President and Vice President as eligible to receive election funding, and to initiate an investigation into whether they were violating campaign-finance laws. *Id.* at 539. When the FEC did not act on that complaint as expeditiously as the petitioner wanted, the petitioner sought review in this Court under the All Writs Act and 26 U.S.C. § 9011(a)—not 52 U.S.C. § 30109(a)(8)(C). *Id.* at 541. The case thus did not even provide any opportunity to opine on the scope of judicial review of FEC dismissal decisions. This Court dismissed the petition to initiate an investigation as premature, obviating the need to consider what "contrary

to law" review encompasses. *Id.* at 542. And while the Court affirmed the FEC's certification of the candidates on the ground that "[t]he Commission has in no way acted in an arbitrary, capricious or unlawful manner," it did so under 26 U.S.C. § 9011(a), which does not confine courts to "contrary to law" review. *Id.* at 547.

ECU is thus left arguing that Congress ratified *Orloski* since it has amended FECA over the years without overriding that decision. ECU Br. 49–50. But courts only presume "congressional acquiescence when there is evidence that Congress considered and rejected the '*precise* issue' presented before the Court." *Rapanos v. United States*, 547 U.S. 715, 750 (2006). "Absent such *overwhelming evidence* of acquiescence," courts "are loath to replace the plain text and original understanding of a statute." *Id.* ECU has presented no evidence that Congress ever considered *Orloski*'s holding. That Congress has not overridden that decision thus reflects nothing more than "Congress's failure to express any opinion." *Id.*

### C.  In Any Event, ECU Could Not Prevail Even Under *Orloski*.

All that aside, the vitality of *Orloski* does not affect this case. Even if "contrary to law" review encompassed arbitrary-and-capricious or abuse-of-discretion review, that review is "[h]ighly deferential," "presumes the validity of agency action," and "permits reversal 'only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment.'" *Hagelin v. FEC*, 411

F.3d 237, 242 (D.C. Cir. 2005) (quoting *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000)).

ECU cannot overcome that substantial deference because it fails to identify any judicially manageable standard for evaluating the exercise of discretion, and therefore could not show an abuse of discretion if it tried. *Chaney*, 470 U.S. at 830 ("[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'"). But even beyond that, ECU has not taken issue with any of the reasons the Controlling Commissioners identified for declining to pursue its complaint. It does not allege (let alone present evidence) that the FEC really does have sufficient resources to pursue every administrative complaint filed, or does not actually have a backlog of cases, or has treated this case dramatically differently from similar cases in deciding which complaints to prioritize. ECU's petition fares no better under *Orloski*'s highly deferential standard of review.

## CONCLUSION

For these reasons, the Court should affirm the dismissal of ECU's petition.

Dated: December 26, 2024

Respectfully submitted,

Paul D. Clement
Erin E. Murphy
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
*paul.clement@clementmurphy.com*
*erin.murphy@clementmurphy.com*
(202) 742-8900 (phone)

s/ *Jason B. Torchinsky*
Jason B. Torchinsky
Edward M. Wenger
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (telephone)
(540) 341-8809 (facsimile)
jtorchinsky@holtzmanvogel.com
emwenger@holtzmanvogel.com

Mark Pinkert
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe Street, Suite 500.
Tallahassee, FL 32301
(850) 270-5938 (telephone)
(850) 741-1023 (facsimile)
mpinkert@holtzmanvogel.com

*Counsel for Intervenor-Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume and word-count limits of Federal Rule of Appellate Procedure 27(d) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 13,000 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Jason B. Torchinsky*
JASON B. TORCHINSKY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 26th day of December 2024, a true copy of the brief was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Jason B. Torchinsky*
JASON B. TORCHINSKY